## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID TURNER,                                          :
                                                       :
             Petitioner,                               :
                                                       :
      v.                                               :
                                                       :
JASEN BOHINSKI, Superintendent, State                  :      NO. _____
Correctional Institution at Dallas; MICHELLE           :
HENRY, Attorney General, Office of Attorney            :
General; LAWRENCE S. KRASNER, District                 :
Attorney, Philadelphia County, Pennsylvania

             Respondent.

## FOURTH PETITION FOR RELIEF PURSUANT TO 28 U.S.C. § 2254 AND
## CONSOLIDATED INITIAL MEMORANDUM OF LAW

Nilam A. Sanghvi
Pa. Atty. ID No. 209989
THE PENNSYLVANIA INNOCENCE
   PROJECT
1515 Market Street, Suite 300
Philadelphia, PA 19102

Amelia Maxfield
Pa. Atty. ID No. 328736
EXONERATION PROJECT
1712 N Street NW, Suite 401
Washington, DC 20036

Thomas W. Hazlett
Pa. Atty. ID No. 88052
Emily Horwitz
Pa. Atty. ID No. 332141
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

*Counsel for David Turner*

Dated: May 1, 2024

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

RELATED PENDING LITIGATION .................................................................................. 2

ELIGIBILITY AND BASIS FOR RELIEF ......................................................................... 2

PROCEDURAL HISTORY AND PRIOR COUNSEL ....................................................... 3

STATEMENT OF FACTS RELEVANT TO PETITIONER'S CLAIM ....................................... 6

    MARIO MARTINEZ'S MURDER AND THE POLICE INVESTIGATION ........................................ 6

    CRIME SCENE PROCESSING ................................................................................... 6

    POLICE INTERVIEWS OF OTHERS AT THE SCENE .................................................... 7

    ROSEMARY MORALES' CHANGING DESCRIPTION OF THE PERPETRATOR ............................. 8

    ROSEMARY MORALES' CUSTODIAL INTERVIEWS ................................................... 8

    DAVID TURNER'S ARREST ................................................................................... 12

    MORALES' FLIGHT, ABSCONDING CHARGES, AND THE PRELIMINARY HEARING ............... 13

    TRIAL ................................................................................................................. 17

        Commonwealth Witnesses ................................................................................... 18

        Defense Witnesses ............................................................................................. 31

        Closings ............................................................................................................. 31

        Deliberations ..................................................................................................... 33

NEW EVIDENCE UPON WHICH THIS PETITION IS BASED ............................................. 34

CLAIMS FOR RELIEF .................................................................................................... 41

    CLAIM 1:    THE COMMONWEALTH VIOLATED TURNER'S FEDERAL DUE
                PROCESS RIGHTS BY SUPPRESSING ROSEMARY MORALES' SEVERE
                MENTAL HEALTH CRISIS ......................................................................... 41

    CLAIM 2:    TURNER IS ENTITLED TO RELIEF BECAUSE PROSECUTORIAL
                MISCONDUCT SO INFECTED THE FAIRNESS OF HIS TRIAL AS TO
                VIOLATE HIS RIGHT TO DUE PROCESS ....................................................... 46

CLAIM 3:    TURNER IS ENTITLED TO RELIEF BECAUSE THE CUMULATIVE
            IMPACT OF THE CONSTITUTIONAL VIOLATIONS AT HIS TRIAL
            RENDERED IT FUNDAMENTALLY UNFAIR, VIOLATING HIS DUE
            PROCESS RIGHTS UNDER THE UNITED STATES CONSTITUTION................. 49

CLAIM 4:    TURNER IS ENTITLED TO RELIEF UNDER THE UNITED STATES
            CONSTITUTION BECAUSE IT PROHIBITS THE INCARCERATION OF ONE
            WHO IS ACTUALLY INNOCENT ................................................................ 49

ALLEGATIONS PURSUANT TO 28 U.S.C. § 2244 ................................................................ 51

REQUEST TO HOLD PROCEEDINGS IN ABEYANCE.......................................................... 53

CONCLUSION AND REQUEST FOR RELIEF.......................................................................... 55

Petitioner David Turner, through his *pro bono* counsel, petitions for habeas corpus relief

pursuant to 28 U.S.C. § 2241, *et seq.*, and the United States Constitution. This petition is being

submitted in connection with a motion filed in the United States Court of Appeals for the Third

Circuit seeking authorization to file a successor habeas corpus petition pursuant to 28 U.S.C.

§ 2244. Accordingly, this petition assumes that such permission has been granted.

## INTRODUCTION

Turner's conviction for second-degree murder, and his subsequent sentencing to life

without the possibility of parole for the shooting death of Mario Martinez,[1] was always based on

the thinnest of evidentiary reeds—the testimony of one witness, Rosemary Morales,[2] who

admitted at the time that she had been using drugs just before the shooting that killed her then-

boyfriend. No other witness tied Turner to the crime. Police never recovered the gun used to

shoot the victim, and, when Turner was arrested, his clothes did not match Morales' description,

nor was there blood or gunshot residue on his shoes, clothes, or person.

What has now been revealed is that the evidentiary reed of Morales' testimony—the only

evidence on which the jury could have possibly convicted Turner, and in the words of the trial

court "the key witness in the case"—was even thinner and more damaged than Turner or his

prior counsel could have possibly known. Through a failure to disclose, as well as through

affirmative misleading conduct, the Commonwealth hid from Turner and his former counsel that

Morales was suffering a severe mental health crisis at the time of the incident and the subsequent

---

[1]    Martinez is referred to by several names in the files and trial transcripts, including Nelson Rivera, Nelson Diaz, and "Cheeno," or "Chino." For consistency with the trial record, except for quotations from witness testimony, we refer to the decedent as Mario Martinez.

[2]    Morales used several names throughout the police investigation and trial, including Carmen Gonzalez, Rosa Diaz, and Rosa Carmona. For consistency with the trial record, we refer to her as Rosemary Morales.

investigation and prosecution, so much so that Morales was contemplating suicide. Authorities were so concerned about Morales' condition that they placed her under suicide watch in protective custody to secure her participation in Turner's preliminary hearing.

These revelations about the true extent of Morales' mental and emotional condition at the time go to the heart of the Commonwealth's prosecution of Turner. Morales' credibility as an eyewitness was the key, indeed, the only, issue at Turner's trial. By withholding the recently revealed information regarding Morales, the Commonwealth deprived Turner of crucial information that could have been used to challenge Morales' identification of Turner as the shooter, and to impeach the police investigation. No reasonable person can have confidence in Turner's conviction, and it should be vacated.

## RELATED PENDING LITIGATION

In addition to moving in the United States Court of Appeals for the Third Circuit for leave to file this successor habeas corpus petition, Turner filed a petition under the Pennsylvania Post Conviction Relief Act (PCRA) on April 29, 2024, in the Philadelphia County Court of Common Pleas. That petition and its exhibits are attached as Appendix A. As of the date of this filing, requests for an evidentiary hearing and a new trial are pending before the state court. The allegations contained in the PCRA petition regarding eligibility and procedural history largely mirror those contained herein. In the interest of comity and judicial economy, Turner therefore requests that the Court hold this habeas petition in abeyance pending the resolution of the state court litigation.

## ELIGIBILITY AND BASIS FOR RELIEF

Turner sets forth in this petition claims based on due process violations under the Fourteenth Amendment to the United States Constitution, and on his actual innocence.

2

## **PROCEDURAL HISTORY AND PRIOR COUNSEL**

1.      Attorney George Newman represented Turner at his preliminary hearing and trial, for post-verdict motions, and through all stages of his direct appeal. Attorney Lee Mandell was court appointed to represent Turner in his first PCRA proceedings. Attorney David Rudenstein was court appointed to represent Turner for an evidentiary hearing in that proceeding.

2.      Turner's jury trial proceeded before The Honorable John Poserina, Jr. from April 4-8, 1988. Turner was convicted of second-degree murder and possession of an instrument of crime on April 8, 1988. He filed post-verdict motions including a motion in arrest of judgment, and for a new trial on April 26, 1988. Judge Poserina held a hearing on those motions on November 30, 1988, and denied them at the end of the hearing.

3.      Turner filed his direct appeal on April 28, 1989. Turner appealed on six grounds: (1) sufficiency of the evidence; (2) the sufficiency of the Court's jury instructions following deadlock; (3) error of the trial court for improperly ruling that a juvenile conviction could be admitted against Turner for purposes of cross-examination; (4) error of the trial court for allowing the testimony of Assistant District Attorney (ADA) Barbara Buba; (5) prosecutorial misconduct for statements made by the prosecutor during closing argument; and (6) violation of Turner's speedy trial rights under Rule 1100.

4.      The Superior Court affirmed on December 14, 1989. Turner filed a request for reargument or reconsideration on December 22, 1989 that the Superior Court denied on January 26, 1990.

5.      Turner filed a petition for allowance of appeal to the Pennsylvania Supreme Court on February 22, 1990. The Supreme Court denied the petition on September 19, 1990.

6.      On December 14, 1989, Turner filed a *pro se* writ of mandamus in the Pennsylvania Supreme Court.

3

7.      On October 30, 1990, Turner filed a *pro se* petition for writ of habeas corpus in federal court under 28 U.S.C. § 2254. On April 8, 1992, Magistrate Judge William F. Hall issued a Report and Recommendation ("R&R") recommending that Turner's petition be denied. Turner appealed to the Third Circuit, which dismissed for lack of jurisdiction on May 20, 1992. On March 8, 1993, District Court Judge Lowell A. Reed issued an order adopting the R&R and denying Turner's first habeas petition.

8.      On July 12, 1996, Turner filed his first PCRA petition, *pro se.* Turner raised several ineffective assistance of counsel claims and due process claims regarding ADA Buba's testimony at trial. Court-appointed counsel Mandell filed a no-merit letter on October 7, 1997. As a result, Judge Poserina dismissed the petition without a hearing on November 7, 1997. Turner appealed to the Pennsylvania Superior Court, *pro se.* The Court vacated the judgment and remanded for further proceedings on June 29, 1999. Court-appointed counsel Rudenstein filed an amended PCRA petition, and the court held an evidentiary hearing on July 25, 2001. Turner filed additional briefing on August 1, 2001. The Court dismissed Turner's amended PCRA petition on September 19, 2001. The Superior Court affirmed on September 16, 2002, and the Pennsylvania Supreme Court denied Turner's petition for allowance of appeal on January 28, 2003.

9.      On May 8, 2003, Turner filed a successive petition for a writ of *habeas corpus* in the Eastern District of Pennsylvania. On December 23, 2003, Magistrate Judge James R. Melinson recommended that Turner's petition be dismissed. Turner filed an amended petition and application for reconsideration under Federal Rule of Civil Procedure 60 on February 2, 2004. The District Court denied those applications on February 3, 2004, and denied a certificate of appealability on September 1, 2004. Turner appealed to the Third Circuit. The Third Circuit

denied the appeal on November 3, 2004. On March 4, 2005, Turner filed a petition for a writ of certiorari with the United States Supreme Court, which was denied.

10.     On May 12, 2005, Turner filed a *pro se* "Motion for *Nunc-Pro-Tunc*" with the Pennsylvania Superior Court, alleging that the Court was required to review the six remaining claims from his 1996 PCRA petition. The Court denied this motion on June 8, 2005. On May 4, 2006, Turner filed a motion in the Court of Common Pleas challenging the legality of his sentence, which the Court treated as a second PCRA petition. On December 22, 2006, Judge Poserina dismissed the petition as untimely. Turner filed a notice of appeal on February 8, 2007. The Superior Court affirmed on August 15, 2007.

11.     Turner filed a third *pro se* PCRA petition on August 8, 2006. On February 6, 2007, Judge Poserina denied the petition as untimely. On April 1, 2008, the Superior Court affirmed. On August 26, 2008, the Pennsylvania Supreme Court denied Turner's petition for allowance of appeal.

12.     On March 12, 2009, Turner filed a third federal habeas petition in the Eastern District of Pennsylvania, which denied it on April 21, 2009. On November 20, 2009, Turner filed a letter motion to appeal to the Third Circuit, which denied the appeal on August 30, 2010. His request for a certificate of appealability was denied on August 3, 2010. He filed a petition for rehearing *en banc* on August 17, 2010, which was denied on September 1, 2010.

13.     On February 3, 2012, through counsel at the Pennsylvania Innocence Project, Turner filed a petition for post-conviction DNA testing seeking DNA testing of the leather gloves found at the crime scene. The Commonwealth opposed Turner's petition. The Honorable Teresa Sarmina granted Turner's petition on June 20, 2013, but the results of the testing were inconclusive.

## STATEMENT OF FACTS RELEVANT TO PETITIONER'S CLAIM

### MARIO MARTINEZ'S MURDER AND THE POLICE INVESTIGATION

14.     On Monday February 2, 1987, at 12:46 p.m., police received a report of a shooting inside 426 West York Street in Philadelphia.

15.     The officers discovered Mario Martinez lying on his back on the second-floor landing, with his feet on the stairs. A Hispanic woman was laying on top of him, sobbing. *See* 2/2/87 Investigation Interview Record of Officer William Sellers (PCRA Pet'n Exhibit 1). The woman identified herself as "Rosa Diaz,"[3] and stated that the decedent was her boyfriend, who had been shot. *Id.* at 2. Morales and Martinez were staying in rooms on the first floor of the building.

16.     Martinez was at or near death when officers arrived, with his pupils fixed and dilated, and no pulse observed. N.T. 4/4/88, 35.

17.     Martinez was transported to the hospital and pronounced dead at 1:32 p.m. on February 2.

### CRIME SCENE PROCESSING

18.     Officers observed blood drops on the third floor in the hallway, and a pool of blood on the second-floor landing where Martinez was found. 2/2/87 Investigation Interview Record of Officer William Sellers at 2.

19.     The Mobile Crime Scene Unit processed the scene for physical evidence. It recovered two projectiles from the scene. One was lodged in the kitchen door in the rear of the first floor; the other was in the wall of the bathroom just above the tub on the second floor.

---

[3]     "Rosa Diaz" is Rosemary Morales.

6

N.T. 4/4/88, 137. A third projectile was recovered from Martinez's body at autopsy. N.T. 4/5/88, 106-07. The three bullets were later identified as .38 caliber. *Id.*

20.     A pair of black leather gloves was found on the second floor. A folding knife had been placed on Martinez's chest. *Id.* at 137; *see also id.* at 47.

21.     The gloves tested positive for lead residue. The gloves and knife did not have blood on them. *Id.* at 121-25.

22.     No drugs were recovered from the scene or from Martinez's body.

### POLICE INTERVIEWS OF OTHERS AT THE SCENE

23.     The police interviewed several other occupants of 426 West York: Luis Julio, Georgia Julio, Daniel Vila, Andres Taveres, and Rafael Lopez.

24.     The statements of the other occupants were consistent: they were in their respective apartments and heard several gunshots and the sounds of running in the hallway but did not see anyone involved in the shooting. *See* 2/2/87 Investigation Interview Record of Luis Julio (PCRA Pet'n Exhibit 2) at 1-2; 2/2/87 Investigation Interview Record of Georgia Julio (PCRA Pet'n Exhibit 3) at 1; 2/2/87 Investigation Interview Record of Daniel Vila (PCRA Pet'n Exhibit 4) at 1-2; 2/2/87; Investigation Interview Record of Andres Taveres (PCRA Pet'n Exhibit 5) at 1-2; 2/2/87 Investigation Interview Record of Rafael Lopez (PCRA Pet'n Exhibit 6) at 1-2.

25.     Vila and Taveres further stated that Martinez kicked the door to their third-floor apartment open and called for help before falling down the steps to the second floor. *See* Investigation Interview Record of Daniel Vila at 1-2; Investigation Interview Record of Andres Taveres.

7

### ROSEMARY MORALES' CHANGING DESCRIPTION OF THE PERPETRATOR

26.      On the scene, Morales gave police a number of different descriptions of the perpetrator and events leading up to Martinez's shooting:

- She said that she only heard the shots. *See* 2/2/87 Investigation Interview Record of Officer William Sellers.

- She then changed her account to say that she was with Martinez when he was shot and saw the shooter from the side. *See* 2/2/87 Investigation Interview Record of Officer Kenneth Brown (PCRA Pet'n Exhibit 7) at 2.

- She described the perpetrator as a black man, wearing a gray hat, green army jacket, blue jeans, and tannish brown boots. *Id.* at 1-2.

- She told some officers the shooter was wearing silver-rimmed glasses. *See* 2/2/87 Investigation Interview Record of Officer William Sellers at 2.

- She told several officers she had never seen the man before. *See* 2/2/87 Investigation Interview Record Officer of Jude McKenna (PCRA Pet'n Exhibit 8) at 2; 2/2/87 Investigation Interview Record of Officer Christina Goodwin (PCRA Pet'n Exhibit 9) at 1. She told another officer that she could identify him if she saw him again. *See* 2/2/87 Investigation Interview Record of Officer Donald Woodruff (PCRA Pet'n Exhibit 10) at 1.

27.      Importantly, Morales did not tell anyone at the scene that she had been threatened by the perpetrator.

### ROSEMARY MORALES' CUSTODIAL INTERVIEWS

28.      Rosemary Morales was transported to the Homicide Division and interviewed by Detective Jeff Piree[4] beginning at 2:30 p.m. Morales' initial interview with Detective Piree is

---

[4]      Detective Piree has a documented history of misconduct and has been involved in

8

documented in an eight-page police statement in question-and-answer format. The interview was

not recorded. Detective Piree later said at trial that Morales' version changed from when he was

not writing it down to when he began to do so. N.T. 4/5/88, 59. He testified that the entire

interview lasted two hours, but activity sheets show that the interrogation lasted significantly

longer. *Id.* at 65; *see also* 2/2/87 PPD Activity Sheets (DT (HF) 000325-38) (PCRA Pet'n

Exhibit 11) at 1 ("[F]or the first five hours of the interview she continued to lie. However in the

fifth hour she seen the light and began telling the truth.").

29.     Morales stated that she and Martinez had been "shacked up" for a year and living

in the first-floor apartment for three days. *See* 2/2/87 2:30 p.m. Investigation Interview Record of

Rosa Diaz (PCRA Pet'n Exhibit 12) at 1.

30.     Morales stated that, before the shooting, Martinez had been outside with another

individual, and she asked him through the window to go to the store and buy her juice. He

returned from the store five minutes later, knocked on the door, and said that they did not have

juice at the store. Morales said she heard one shot and opened the interior apartment door. She

---

convictions where the defendant was later exonerated, including those of Chester Hollman and
John Miller. Multiple lawsuits against Detective Piree allege serious misconduct including the
suppression of exculpatory evidence. *See* Claudia Lauer, "Exonerated Philly man sues city over
withheld evidence," *York Dispatch* (Mar. 17, 2021), *available at* https://
www.yorkdispatch.com/story/news/2021/03/17/exonerated-philly-man-sues-city-witheld-
evidence/115572518 (last accessed April 24, 2024); *City and Chester Hollman Announce
Settlement of Wrongful Conviction*, available at https://www.phila.gov/2020-12-31-city-and-
chester-hollman-announce-settlement-of-wrongful-conviction/#:~:text=against%20the%20City.-
,,was%20exonerated%20for%20in%202019 (last accessed Apr. 14, 2024); Chris Palmer, "He
spent 22 years in prison for a murder he didn't commit. His lawsuit says Philly police detectives
knew his case was flawed," *The Philadelphia Inquirer* (June 24, 2020), *available at*
http://www.inquirer.com/news/philadelphia/john-miller-philadelphia-murder-exoneration-
lawsuit-detectives-wrongful-conviction-20200624.html (last accessed Apr., 14, 2024); *see also
John Miller III v. City of Philadelphia, Jeffrey Piree, William Coogan, Richard Bova, John Bell,
and Michael Sharkey*, 2:20-cv-03054 (E.D. Pa.); *Donald Michael Outlaw v. City of Philadelphia,
Jeffrey Piree and Howard Peterman*, 21-CV-01290 (E.D. Pa.).

heard footsteps running up the stairs. She opened the door and saw a man from the back running up the stairway. *Id.* at 2, 4.

31.     Morales described that man as a black male, 30-35, 6 feet tall, 170 lbs., with black curly hair with gray on the sides; he was wearing an army jacket, "Sergio" jeans, and work boots. *Id.*

32.     Morales initially said that she was hiding behind the door while the shooting happened and did not emerge from her apartment until she heard the man run past. *Id.* at 3. She said that when she walked out, "Danny" from the third floor told her that Martinez had been shot. She found Martinez lying on his back in the stairway between the second and third floors. *Id.*

33.     Morales told Detective Piree that she used cocaine earlier in the day but was not under the influence at that time. *Id.* at 3-4.

34.     Detective Piree then asked a series of questions that could have implicated Morales in the crime. Morales responded "no" or "I don't know" to each question. Then, without apparent prompting, she stated, "oh wait, Nelson had an argument with this guy Daule-Daole-the black guy I told you about today that ran up the stairs." *Id.* at 6.

35.     Morales then told Detective Piree that she observed Martinez and "Daule" having an argument on Friday night, around 11:00 p.m., at 4th and Diamond Streets.

36.     Morales proceeded to describe a much different scenario than in her earlier statements to police. Morales said she was in Rafael Lopez's apartment, freebasing cocaine, when Martinez knocked on the hallway door. She opened the door, and Martinez told her he had a bundle of "dope" and asked her to help him sell it. She declined but offered to hold it. Martinez got mad and began to walk out. "Daoul" entered the building and said he had $18.50 for a bag of

drugs. Morales said Martinez told Daoul he could not sell it for that price, so Daoul reached into his pocket and pulled out a gun. Martinez ran up the stairs, and Daoul shot at him. The first time he missed, and they kept running up the stairs. Morales heard Martinez get to the third floor and then fall, and she heard two shots. Morales then said she saw Daoul run down the steps and, as he did, he pointed the gun at her and said, "bitch, if you tell, I kill you too." *Id.* at 6-7.

37.     Morales told Detective Piree that the person she identified as "Daoul" lived on Orianna between Norris and Diamond. *Id.* at 7.

38.     Morales described Daoul as a black male, medium caramel complexion, 175-185 lbs., a little over 6 feet tall, black hair, clear face,[5] maybe 34-38; he was wearing "Sergio" faded jeans with blood on the right leg, work boots, a green army jacket, and a grey knit hat. *Id.* at 8. She also described Daoul's cousin "Bobby" as "short, chubby and big fat hands, dirty looking and scars on his face with black hair, 24-25 years old." She said that Daoul was wearing "Bobby's" jacket when he shot Martinez, which she knew because Bobby's name was written on it. *Id.*

39.     She also stated that she saw "Daoul" with a different gun on Friday at Bobby's house and that she knew he had .38's and a shotgun.

40.     At Turner's subsequent trial, Detective Piree described Morales' demeanor during this interview as "nervous, upset. She cried a few times. She was a little bit frightened. She was coherent, sober, aware of where she was, what we were talking about. She had full control of her faculties." N.T. 4/5/88, 56.

---

[5]     The typed version of Morales' statement to Detective Piree uses the words "clear face," but handwritten notes in the homicide file from this interview say "clean face." Handwritten Notes (DT (HF) 000255) (PCRA Pet'n Exhibit 13). In the application for a search warrant for Turner's shoes, Detective Bova also uses this description. *See* Search Warrant (DT (HF) 000214-16) (PCRA Pet'n Exhibit 14).

11

### DAVID TURNER'S ARREST

41.    Following Morales' various statements to police, Detectives Hoffner, Campbell, Bova, and Piree "took to the streets" with Morales hiding in the back of an unmarked police car to find "Daoul." *See* 2/2/87 PPD Activity Sheets; *see also* 2/2/87 9:35 p.m. Investigation Interview Record of Rosemary Morales (PCRA Pet'n Exhibit 15).

42.    Eventually Morales pointed out "Bobby," supposedly "Daoul's" cousin, on the street. When Detective Piree exited his vehicle, Bobby began to flee. Detective Piree chased Bobby through a field, through a vacant lot, to the rear of a home, and into a house on the corner of Diamond Street west of Orianna.[6] N.T. 4/5/88, 52. According to Detective Piree, "there became a slight altercation inside the house. The male I was pursuing fled out the front of the house." *Id.* The police were not able to locate him.

43.    When Detective Piree returned to the vehicle following the failed effort to apprehend Bobby, Morales then pointed to a man standing on the sidewalk near 2051 N. Orianna and stated that the man was "Daoul." *Id.* The man Morales pointed to was David Turner, and he was arrested without incident.

44.    When Turner was arrested, he was wearing black corduroy pants, a red shirt, a dark blue down jacket, a black/maroon knit cap, and brown boots. He was not wearing glasses. He was described by the police as 6'2", 195 lbs., medium complexion, brown eyes, dark brown hair, and well built. *See* Biographical Information Sheet (DT (HF) 000373-74) (PCRA Pet'n Exhibit 16). In his arrest photo, Turner had a beard. N.T. 4/5/88, 21. His nickname was recorded as "Dawud." Biographical Information Sheet (DT (HF) 000373); *see also* N.T. 4/5/88, 21.

---

[6]    "Bobby" was apparently never identified or interviewed, but is described in the record as Bobby Wheeloss, Bobby Dollard, or Bobby Bey.

45.    The police did not find any operable firearms nor any clothing items matching Morales' description at 2051 N. Orianna. N.T. 4/5/88, at 32.

46.    Police also interviewed Deborah Leak who stayed at 2051 N. Orianna. She stated that she and Turner purchased drugs at 426 W. York Street, but never from Martinez. *See* 2/12/87 Investigation Interview Record of Deborah Gean Leak (PCRA Pet'n Exhibit 17) at 3.

47.    Detectives Hoffner and Piree interviewed Turner at approximately 10:00 p.m. on February 2, 1987. He was advised of his *Miranda* rights and waived them. He denied shooting Martinez. *See* 2/2/87 Investigation Interview Record of David Turner (PCRA Pet'n Exhibit 18) at 1.

### MORALES' FLIGHT, ABSCONDING CHARGES, AND THE PRELIMINARY HEARING

48.    Turner's preliminary hearing was originally scheduled for February 11, 1987. Morales did not appear. Detectives spoke to a friend of Morales who told them that Morales' grandmother had received a threatening phone call on February 4, stating that "if Rosa talks they would kill her." 2/5/87 Investigation Interview Record of Nilda Rodriguez (PCRA Pet'n Exhibit 19).

49.    On February 12, Morales was located at a friend's house, arrested, and charged with being an absconding witness. She gave a third police statement in which she said that she did not want to testify and that, if released, she would go to New Jersey to avoid testifying. *See* 2/12/87 Investigation Interview Record of Rosemary Morales (PCRA Pet'n Exhibit 20). She also stated that when the police returned her to her apartment around 1:30 a.m. on February 2, there was a man waiting for her inside who threatened to kill her if she testified. *Id* at 2-3.[7]

---

[7]    There has never been any contention that this man was David Turner, as he was in custody at this time. Morales never identified or described this person aside from stating that he was a black man. No one, including Turner, was ever charged with intimidating Morales.

50.     When Morales failed to appear on February 11, the preliminary hearing was
rescheduled for February 25, 1987. On that date, Morales refused to cooperate without a lawyer
present and demanded her lawyer, Reuban Rodriguez. N.T. 4/6/88, 6.

51.     On February 25, 1987, the Commonwealth, through District Attorney Ronald
Castille, petitioned the court to grant immunity to Morales. The petition stated that Morales
failed to appear at the original preliminary hearing date on February 11 and that she was
"expected to refuse to testify on February 26, 1987 or at the next preliminary hearing listing on
the basis of her privilege against self-incrimination." 2/25/87 Petition for Immunity (PCRA Pet'n
Exhibit 21). The petition placed no limits on Morales' immunity aside from those codified in 42
Pa. C.S. § 5947, which states that the only crime which may be prosecuted with information
derived under an immunity order is perjury. *See* 42 Pa. C.S. § 5947(d)(1).

52.     The court granted Morales general immunity on February 26, 1987. *See* Order for
Immunity (PCRA Pet'n Exhibit 22).

53.     Ultimately, Turner's preliminary hearing took place on February 26, 1987. ADA
Barbara "Bashi" Buba represented the Commonwealth, attorney George Newman represented
Turner, and Reuban Rodriguez represented Morales. Judge Louis Presenza presided. The
Commonwealth called two witnesses, Rosemary Morales and Detective Piree. The parties
stipulated that the Medical Examiner, Dr. Catherman, would testify that Martinez died from a
single gunshot wound to the chest and that the manner of death was homicide. N.T. 2/26/87, 4.

54.     Morales testified that she and Martinez were seeing each other on February 2,
1987. That day, she was inside her first-floor apartment at 426 W. York Street when she heard
shots around 10:45 a.m. *Id*. at 7-8.

14

55.    She opened the door to look out and saw a man running up the stairs after Martinez. She testified that she never saw his face and instead "just got a back look." *Id.* at 8-9.

56.    Morales stated several times that she never got a good look at the perpetrator. *Id.* at 8-10.

57.    Morales was asked if she identified David Turner to police, and she said she did, "but, like I say, I wasn't that sure. I only took a back look of the guy." *Id.* at 10.

58.    Without a judicial finding that Morales was now unavailable for cross-examination, her police statements were read into the record as substantive evidence. *See id.* at 13.

59.    ADA Buba asked Morales if she remembered telling Detective Piree that someone named "Daul" shot Martinez. Morales replied: "I was too high when I went over—I was too high. I just got finished freebasing. I don't remember that statement." *Id.* at 14.

60.    Morales also testified that she was high when she gave her police statements and that, "I couldn't remember, after, what happened to me, I seen it—I was like—it wasn't me. I didn't have my head on my shoulder. I feel like my head was in another world." *Id.* at 28-29.

61.    She testified that when she returned from her police interview on February 2, there was a man waiting in her room who said that he would "shoot her too" if she talked. *Id.* at 26.

62.    On cross-examination, Morales admitted that she wrote "fuck you" on the subpoena she was given for the original preliminary hearing on February 11. *Id.* at 25.

63.    Morales further admitted that she was afraid that the police might blame the shooting on her. *Id.* at 28.

15

64.     She testified that she did not want to be interviewed at the police station and that she wanted to get out of that situation as quickly as possible. *Id.* at 33. When asked if she knew that to leave the police station, she had to tell the detectives who did it, she responded, "No, I didn't. I didn't knew that until they told me." *Id.* She then refused to answer more questions until speaking to her lawyer. *Id.* at 34. After a consultation with Rodriguez, cross-examination resumed.

65.     At the conclusion of Morales' testimony, her attorney inquired about the status of her pending charges. *Id.* at 38-39. ADA Buba responded that she wanted to handle that after the preliminary hearing. When Newman requested to know the status of Morales' charges ADA Buba responded, "I haven't quite decided." *Id.*

66.     Detective Piree was questioned about the statement he took from Morales on February 2, 1987. *Id.* at 39-40.

67.     He stated that Morales did not appear to be under the influence and that "she cried sometimes, not hysterically, but she cried sometimes because of the shooting of her common law husband." *Id.* at 40.

68.     He also explained that Morales had pointed Turner out to officers during her ride-along on February 2 as the person who shot Martinez, resulting in Turner's arrest. *Id.* at 41-42.

69.     Detective Piree was cross-examined about the circumstances of Morales' first police interview. He stated that questioning began at around 2:30 p.m. and that he immediately began typing questions and answers. *Id.* at 43-44.

70.     Detective Piree testified that after Morales' statement was taken, officers entered the room to comfort her.

> [S]he was alone in the room by herself, she had acknowledged the statement and signed it, she was sitting there alone and she was very depressed when she found out

how serious her boyfriend was injured or deceased. And she was thinking about suicide. At that time, I believe, another detective talked to her for a while and I talked to her for a while. We were trying to console her.

*Id.* at 46.

71.     At the conclusion of the hearing, Judge Presenza set bail for Turner at $250,000. *Id.* at 60.

72.     Despite having not "quite decided" following Morales' testimony what the disposition of her case would be, ADA Buba immediately *nolle prossed* absconding witness charges against Morales at the conclusion of the preliminary hearing. N.T. 4/6/88, 9.

### TRIAL

73.     Turner's trial began on April 4, 1988. Andrea Foulkes prosecuted the case for the Commonwealth. George Newman again represented Turner. Judge John Poserina, Jr. presided. On April 8, 1988, the jury convicted Turner of second-degree murder and possessing instruments of crime. Turner was sentenced to life without parole. *See* Docket Sheet, *Commonwealth v. Turner*, CP-51-CR-0304121-1987 (PCRA Pet'n Exhibit 23).

74.     The defense filed an omnibus pre-trial motion to suppress Turner's statement to police, and Morales' identification of Turner. *See* Omnibus Pre-Trial Motion (PCRA Pet'n Exhibit 24). The court held argument on the motion on March 29. That day, the Commonwealth announced that it might seek the death penalty. N.T. 3/29/88, 7-8.

75.     The Commonwealth called Detective Piree, who testified regarding Morales' interview and identification of Turner. *See generally id.* at 26-65. Detective Bova testified to preparing the application for Turner's arrest warrant. *Id.* at 68-93.

76.     On the morning of jury *voir dire*, March 30, 1988, defense counsel announced

that he was withdrawing the motion "and in exchange the District Attorney has agreed not to

pursue the issue of death qualification." N.T. 3/30/88, 2.[8]

77.     The case against Turner hinged solely on Morales' testimony. No other evidence

implicated him at trial.

78.     The Commonwealth attempted to explain Morales' inconsistent statements and

failure to consistently cooperate by arguing that she was acting out of fear after being threatened

by Turner during the shooting and then threatened by an unknown black male hours later. The

defense, in turn, argued that Morales was not credible and was acting out of self-interest,

implicating Turner to avoid being suspected of murdering Martinez and cooperating in the hopes

that it would resolve her many outstanding criminal cases.

### Commonwealth Witnesses

79.     The Commonwealth called only one civilian witness, Rosemary Morales, and

otherwise used a bevy of law enforcement officials to bolster Morales' testimony.

### Rosemary Morales' Testimony

80.     Morales testified differently at trial than she had at the preliminary hearing.

81.     This time, Morales stated that on February 2 she asked Martinez to go to the store

and get her orange juice, and he returned saying that they did not have juice at the store. N.T.

4/4/88, 68-69.

---

[8]     Turner only recently became aware that ADA Foulkes sought permission from her
superiors to seek the death penalty but was denied permission to do so. *See* 3/29/88
Memorandum from ADA Foulkes (DT (DAO) 235-36) (PCRA Pet'n Exhibit 25); *see also*
3/30/88 Note from ADA Harley (DT (DAO) 000241) (PCRA Pet'n Exhibit 26). Unbeknownst to
Turner and his attorney, pursuing the death penalty had *not* been authorized and was ultimately
denied at the time the defense withdrew the suppression motion.

82.     Then, "Dawul" knocked on their door and asked Martinez if he would "give him a

break of $18.50 for a bag of heroin." *Id.* at 69.

83.     Morales identified Turner as "Dawul." *Id.* When asked how long she knew Turner

she said, "well, not long enough? … I seen him a couple of times." *Id.* at 71.

84.     Morales then recited her account of the shooting which was largely consistent

with her *second* statement to Detective Piree:

> He asked him to give him a break of $18.50 when the bag was $20. He say—Cheeno
> told him he couldn't. So he left out. When he came back in he fired. Cheeno tried
> to get away. But when he got upstairs—I can't talk … when the first shot came, he
> tried to get away. He run upstairs to the second floor. But he couldn't get away
> because the window upstairs was locked. So I just heard something fell down the
> steps, okay, by the tie I heard the steps and come back, somebody ran down. I didn't
> know if it was Nelson or Dawul. But when I went up to them, he was laying right
> there. I know he wasn't dead, but I was so scared to go up and call the cops. By the
> time somebody in the building called the cops, by the time they got there, he was
> dead.

*Id.* at 70.

85.     Morales was then asked if she saw Dawul again, and she said "Yes. He said if I

would have testified it would have been my life or my family's." *Id.*

86.     Morales testified that when the shots were fired, she was inside her apartment

"trying to hide." *Id.*

87.     Morales recognized Turner by his voice because she did not see his face. *Id.* at 71.

"Well, I ain't seen no face, but I could remember voices. I don't got to see the face to remember

your voice." *Id.* at 99.

88.     She then stated that she saw Turner through a cigarette burn mark made in a

curtain that covered her front door, through which she looked into the hallway. *Id.* at 72.

89.     Following the gunshots, she said she heard someone running down the stairs. She

"peeked out the door" and saw someone "in the lot … one house away from the house where we

19

was at." *Id.* at 74. From the lot, apparently outside the building, the person who she identified as

Turner said, "if I speak he will shoot me too." *Id.* at 71. That person was wearing jeans, brown or

beige boots, and an army jacket. *Id.* at 75.

90.     After hearing gunshots and being threatened, Morales "just didn't pay that no

mind and went upstairs, because I didn't heard Cheeno no nothing, so I thought he probably just

got hurt and he was still living. But when I got there he was dead." *Id.* at 76.

91.     Morales testified that the folding knife was laying on his chest when she got to the

body. Martinez had asked her to lend him the knife earlier that morning before the shooting. *Id.*

at 77.

92.     She also testified that Martinez had drugs on him before the shooting, and

afterwards she searched his body, but they were gone. *Id.*

93.     Morales further testified to her interactions with police. She did not recall

speaking with Officer Woodruff. *Id.* at 80. She remembered being driven to 8th and Race to give

a statement. *Id.* at 81. She stated that after her police interview, she got in the car with detectives

and "drove around to see if we see him." *Id.* She stated that they drove to American and

Susquehanna Streets and waited five to ten minutes. They continued driving, and "as we was

riding up the street, he was coming out. So I pointed to him, and the cops told me to get down in

the car and to cover me with some newspapers. That's when they locked him up and took me

back to 8th and Race." *Id.* Morales was not asked about, and did not testify to, first identifying

Bobby or the subsequent police chase.

94.     After Turner's arrest, Morales gave a second statement at Homicide and then was

driven home by detectives. She testified that she walked into her apartment around 1:30 a.m. *Id.*

20

at 82. When she entered her apartment, there was a man there who "told me if I try to testify or something I will go with Cheeno to hell." *Id.* at 83.

95.     Morales testified that she left her apartment and went to her stepfather's house and slept there and then tried to "hide." "… I just tried to hide. And then the Homicide wagon they arrested me again." *Id.* at 84.

96.     Morales was asked why she had to be arrested to come to court. She stated that it was because she was scared. *Id.* at 85.

97.     Morales had picked up new charges since the preliminary hearing and disclosed that she had to be brought to court by the police. *Id.* at 88.

98.     Finally, when asked why she was testifying she said, "mainly because I want to get my case cleared, and I sure do not want to see a murder[er] to walk the streets for somebody who was a true friend to me." *Id.* at 89.

99.     On cross-examination, Morales was asked about her various aliases. *Id.* at 89-91. She stated that she was on probation and had new charges. *Id.* at 91.

100.    When questioned about ducking her subpoena for this case and absconding, Morales denied that the police had to search for her but admitted to writing "fuck you" on the subpoena when she was originally served. *Id.* at 93-97.

101.    Morales admitted to lying under oath at the preliminary hearing. *Id.* at 97. She denied that she was charged as an absconding witness. *Id.* at 94-95. She also denied being granted immunity in exchange for her testimony before eventually stating that she did not remember being granted immunity. *Id.* at 115-17.

102.    Morales was questioned about her drug use. She stated that she was a habitual cocaine user and bought and sold cocaine. *Id.* at 103. At the time of the crime, she was

freebasing. *Id.* at 101. However, Morales stated that cocaine did not impair her memory and only made her more alert. She stated that she lied when she said she could not remember giving her police statement because she was high. *Id.* at 111.

103.   Morales was pressed on whether she implicated Turner to get out of trouble. She admitted that Detective Piree started asking her if she and Martinez had any arguments and that he asked if she shot Martinez. *Id.* at 104, 108.

104.   Eventually during her testimony Morales became uncooperative, stating: "I'm not going to answer shit to you." *Id.* at 112.

105.   On re-direct, Morales testified that she was across the street when Turner and Martinez argued the Friday before Martinez was shot. *Id.* at 118. During the argument, Turner held the fake shotgun recovered from 2051 N. Orianna. *Id.* at 124-25.

106.   She also stated that Turner was wearing "Bobby's" army jacket during the shooting and that the jacket had the name "Bobby" on it. *Id.*

107.   Morales was asked again about the circumstances of her testimony at the preliminary hearing. She stated that she was under arrest when she came to court. ADA Foulkes then asked "Now, after that was all over did anything bad happen to you?" Morales responded "no" and then was asked "did anything especially good happen to you?" Morales again responded "no." *Id.* at 127.

108.   On re-cross Morales again became uncooperative. *Id.* at 130-31.

### Testimony of Responding Officers and Medical Examiner

109.   Officers William Sellers and Kenneth Brown testified that they were the first to arrive on scene on February 2, 1987. They encountered an "unknown Hispanic male" who stated that there was a shooting in the house. They went to the second floor and found Martinez lying

on the second-floor landing on his back, with his feet up the stairs, with a folding knife on his chest, and a Hispanic female crying over him. N.T. 4/4/88, 34-39; *see also id.* at 55, 57, 59-60.

110.    Martinez did not have a heartbeat when Officer Sellers arrived. *Id.* at 35.

111.    Officer Sellers observed blood in the third-floor hallway. *Id.* at 37-38.

112.    Morales, who was identified as the Hispanic female but was using a different name, gave them a description that they sent out over the radio: "Negro male, wearing a gray cap, green army jacket, jeans, and a pair of tan work boots." *Id.* at 44. Morales also said the person was wearing silver-rimmed glasses. She did not say the name "Dawul" or David Turner. *Id.*

113.    Officer Brown also testified that when he initially asked Morales what happened, she said that she did not know and that she had just heard shots. Then she said that she was standing with Martinez and a man came and fired shots, they ran, and she could only see him from the side. *Id.* at 55.

114.    Officer Donald Woodruff testified that he had arrested Morales numerous times in the neighborhood, as recently as the Friday before trial. *Id.* at 65. He also testified that Morales told him that she knew who shot Martinez and she knew where he lived. *Id.* at 63.

115.    On cross-examination, Officer Woodruff was impeached with his statement to Detective Hoffner in which he said, "she came out with me and I asked her who did it, and she stated that she would know the male by his face if she saw him." *Id.* at 63. He admitted that she did not tell him she knew where the perpetrator lived and that he had heard that from detectives discussing the case. *Id.* at 66.

23

116.    Multiple officers testified that there was no lighting in the second-floor hallway and that they needed flashlights to see because the hallways in the building were so dimly lit. *See id.* at 47; N.T. 4/5/88, 147.

117.    Dr. Halbert Fillinger read from the report of Dr. Catherman who performed the autopsy on Martinez. During his testimony, the parties stipulated that the cause of death was a gunshot wound and the manner of death was homicide. N.T. 4/5/88, 87. Dr. Fillinger stated that Dr. Catherman found that the bullet struck Martinez in the front of his chest and travelled backwards "from above, downward, from front to back, and slightly to the right." *Id.* at 91. On cross-examination, Newman asked "… in order for it to have gone downward, the person firing would have had to have been a little bit above Mr. Rivera or Mr. Rivera would have had to have been leaning forward and facing the individual?" Dr. Fillinger responded "those are two of the possibilities that could exist." *Id.* at 99.

### Testimony About Physical Evidence

118.    A .38 caliber jacket projectile was removed from Martinez's body. *Id.* The wound on Martinez showed no evidence of powder residue, so it was not possible to determine the range of the gunshot wound. *Id.* at 93. Martinez also had cocaine, morphine, and heroin in his system at autopsy. *Id.* at 96.

119.    The Mobile Crime Detection Unit identified two projectiles at 426 W. York Street: one in the kitchen door in the rear of the first floor, which had traveled through the staircase and lodged in the door, and another in the wall of the bathroom just above the bathtub on the second floor. *Id.* at 137.

120.    Officer Brenda Butler guessed that, based on the trajectory of the bullets, the shooter fired up the stairwell while standing on the first floor, then advanced up the stairway towards the second floor to fire the second shot. *Id.* at 142.

24

121.    The Firearms Identification Unit (FIU) could not compare the projectiles removed

from the crime scene with the jacket found in Martinez. The FIU was only able to hypothesize

that the projectiles were likely the same caliber and were sufficiently "consistent, from the lands

and groove markings, to have come from a similar firearm." *Id.* at 106-08.

122.    Two search warrants were issued. One was for the boots Turner was wearing

when he was arrested, based upon the affirmation of Detective Richard Bova that the boots had

blood on them,[9] and the second was for firearms and other evidence potentially located at 2051

N. Orianna. *Id.* at 27-29.

123.    Turner's boots were seized when he was arrested. They were analyzed for the

presence of blood, and none was detected. *Id.* at 127.

124.    Two "firearms" were recovered from 2051 N. Orianna Street. One was an

inoperable BB gun, and the other was an item made of wood and rod and wrapped with black

tape, made to look like a firearm. Both "weapons" were incapable of propelling a projectile, and

thus were incapable of firing a .38 caliber bullet. *Id.* at 109-11, 113.

125.    A pair of leather gloves was found in the hallway; one glove was at the bottom of

the third-floor steps on the landing, and the second was in the second-floor hallway. *Id.* at 138;

*see also* N.T. 4/5/88, 8.

126.    Officer Butler testified that she did not dust for fingerprints because the gloves

had been used in the commission of the crime. *See* N.T. 4/5/88, 145.

---

[9]    Detective Bova testified that he made this representation based on a stain that he
observed on the boots. However, his sworn statement in the warrant is far more specific:
"On 2/2/87, the deft., [T]urner was arrested and was wearing a pair of tan boots with
blood on the boots. It is requested that a night time warrant be issued so that law
enforcement authorities can take the boots from the deft to compare, if possible, the blood
on the deft's boots to the blood of the deceased." Search Warrant (DT (HF) 000214-16).

127.    No blood was detected on the two items left at the crime scene—a folding knife placed on Martinez's chest and the leather gloves. *Id*. at 121, 125.

128.    The leather gloves contained trace amounts of lead residue, which could be indicative of firearm use. *Id*. at 122, 124.

129.    No other physical evidence was found, and the .38 caliber firearm used to shoot Martinez was never recovered.

### Testimony About David Turner's Arrest

130.    To find Turner, Morales rode in the back of an unmarked police car and directed Detectives Bova and Campbell towards 2051 N. Orianna, which is where she said the perpetrator lived. *Id*. at 12-13. Morales was slouched down so as not to be noticed but could still see out the window: "Her head was—or her eyes were above the door area of the dashboard area of the vehicle, so that she could view from the side windows and also the front window of our vehicle." *Id*. at 12.

131.    As they were driving, Morales pointed out "Bobby." Bobby was standing on the corner, wearing a green army jacket, just as she had described the perpetrator. *Id*. at 14. Detective Piree left the vehicle and approached him, but Bobby fled, running through a vacant lot, into a back alleyway off Diamond Street, and into the rear of a house on that block. *Id*. at 14-15, 51-52. Detective Campbell left the car and joined Detective Piree in pursuit of Bobby. *Id*. at 14-15.

132.    After returning to the car, Detective Campbell drove around the block to the twenty-hundred block of North Orianna Street. There, Morales pointed out Turner, and Detective Campbell placed him under arrest. *Id*. Turner was standing on the street along with many other individuals and was speaking to a uniformed police officer when Morales identified him. *Id*. at 44.

26

133.    The defense admitted Turner's arrest photo as Exhibit D-1. The photo showed that Turner had facial hair at the time of his arrest. *Id.* at 21. When he was arrested, Turner said his nickname was Dawud. He was wearing a black cap, dark blue down jacket, a red shirt, black corduroy pants, and brown boots. *Id.* at 63-64. He was not wearing a green army jacket, jeans, a red and blue flannel shirt, a gray cap, or glasses, the clothing that Morales had described the perpetrator as wearing.

134.    After his arrest, Turner waived his *Miranda* rights and gave a statement to the police. N.T. 4/5/88, 132-37.

135.    Through Detective Hoffner, the Commonwealth read Turner's statement into the record. *Id.* at 138-42.

136.    Detective Hoffner stated that after giving his statement, he informed Turner that Morales had identified him, and Turner "got nervous and he slumped down in the chair. He wouldn't look at me after that point." *Id.* at 143.

137.    Detective Hoffner also drove Morales home after her second interview around 1:30 a.m. on February 3. He said he waited until she got in the house and then drove away. *Id.* at 146.

138.    Defense counsel crossed Detective Hoffner about whether Turner appeared like someone who had ingested twelve bags of heroin before his police interview, which is the amount allegedly stolen from Martinez's body. Detective Hoffner stated "he appeared normal." *Id.* at 149-50.

139.    Detective Piree also testified about his custodial interview of Morales. He stated that he had an unrecorded conversation with her first, in a homicide interrogation room, and then began typing recorded questions and answer responses. *Id.* at 55.

27

140.     Detective Piree did not observe her to be under the influence of any substances, but stated that she was "nervous, upset. She cried a few times. She was a little bit frightened. She was coherent, sober, aware of where she was, what we were talking about. She had full control of her faculties." *Id.* at 56.

141.     He stated that when he was not typing her answers, Morales' story was different from when he was typing them. *Id.* at 59. While he was not typing, she said that she was standing in the hallway when a man pursued Martinez up the stairs, pulled a gun out, chasing and firing shots. The man then ran back down the stairway, passed her, and put a gun in her face and threatened her. *Id.*

142.     When Detective Piree began typing, Morales "changed it to where she was back in her apartment at the time of the pursuit and she was not able to see that much." *Id.*

143.     He said he "approached her verbally and said 'I want you to tell me the truth now.'" *Id.*

144.     According to Detective Piree, Morales was never a suspect, and he never suggested that to her. *Id.* at 60.

145.     The Commonwealth asked whether Morales was "concerned about anything, in regards to this matter?" Detective Piree responded that she was "fearful of the defendant and she seemed very much remorsed [sic] of the deceased." *Id.* at 62.

146.     On cross-examination, Detective Piree was questioned about the differences between Morales' first, unrecorded statement and what he typed. *Id.* at 65-66. For example, Morales initially described the perpetrator to him as a black man with curly hair that is gray on the side, and she did not mention the name Dawud. *Id.* at 67.

28

147. Throughout his testimony, Detective Piree described Morales' demeanor as "remorseful" several times. *Id.* at 69, 70.

148. The Commonwealth's final witness was ADA Buba, who had represented the Commonwealth at Turner's preliminary hearing. N.T. 4/6/88, 5.

149. ADA Buba largely testified about an unrecorded conversation that occurred between herself, Morales, Morales' attorney Reuban Rodriguez, an Officer Deyne, and a Detective Ballentine in the courtroom before the preliminary hearing on September 26, 1987. *Id.* at 6.

150. Morales was under arrest at this time, had been charged with absconding, and had been detained on other bench warrants. *Id.* at 6-7. Although unknown at the time of trial, she was also under suicide watch. *See* "New Evidence Upon Which This Petition Is Based," below.

151. During this conversation, ADA Buba discussed the substance of Morales' testimony with her. She stated that she went over the statement Morales gave to Detective Piree and asked her "what was the truth. Was it true that she could identify the defendant as the person who was involved in this shooting, or did she not see it." N.T. 4/6/88, 14.

152. According to ADA Buba, Morales "had indicated to me in the back that the defendant as the person that had done the shooting." *Id.*

153. ADA Buba recited what she said Morales told her in the courtroom, and it was nearly identical to what was in the second half of Detective Piree's statement. *Id.* at 15-17.

154. The Commonwealth read Morales' preliminary hearing testimony to the jury through ADA Buba. *Id.* 19-48.

155. ADA Buba attempted to explain why she offered Morales immunity. Morales apparently told ADA Buba that she planned to plead the Fifth. To ensure that Morales would

29

testify, ADA Buba spoke to Morales' attorney and told him that she would give Morales immunity "as to her testimony in the homicide trial so that it wouldn't affect her absconding witness charge." *Id.* at 10. ADA Buba stated that she thought Morales' testimony would hurt Morales in her absconding witness case.

156.    The immunity agreement was not limited to the absconding case, but instead provided immunity for anything other than perjury arising from Morales' testimony. *Id.* at 67.

157.    ADA Buba withdrew the absconding witness charge immediately after the preliminary hearing. *Id.* at 49-50.

158.    On cross-examination, ADA Buba was asked whether she reported her conversation with Morales to the police to memorialize a statement, and she said no. *Id.* at 52.

159.    ADA Buba was crossed about a handwritten memo she prepared after the preliminary hearing regarding her conversation with Morales. That memo only contains one statement from Morales, and not the lengthy statement ADA Buba recited to the jury. *Id.* at 54-55; *see also* Memo from ADA Buba (DT (DAO) 000278-79) (PCRA Pet'n Exhibit 27).

160.    ADA Buba was asked whether she had any personal knowledge that led her to believe that Morales was telling the truth. She testified "that's just based on my personal opinion and beliefs." N.T. 4/6/88, 73.

161.    After ADA Buba's testimony, the defense moved for a mistrial on the basis of improper vouching by ADA Buba, as well as on the grounds of comments made by ADA Foulkes about Newman while ADA Buba was on the stand, in front of the jury.[10] Both requests were denied. *Id.* at 78.

---

[10]    During her re-direct of ADA Buba, ADA Foulkes implied that Newman inappropriately suggested that there was a "secret deal" between Morales and the Commonwealth, to which Newman objected. N.T. 4/6/88, 70. ADA Foulkes also characterized Newman's cross-

162.    The defense also moved for a *demurrer* at the close of the Commonwealth's case citing the unreliability of Morales. This was also denied. *Id.* at 79.

**Defense Witnesses**

163.    The defense called one witness. Officer Christina Goodwin testified that Morales told Goodwin that she had never seen the shooter before and merely described him as a "black male with light skin." *Id.* at 81.

164.    On cross, Officer Goodwin testified that Morales was "terribly hysterical and sobbing" when she arrived. *Id.* at 82.

165.    The parties then stipulated that that if Officer McKenna was to testify, he would say that he responded at 12:50 pm, he was one of the first officers on scene and that Morales gave him a description of the man she saw leaving: "She told us that it was a black male wearing a green army jacket, dungarees, green knit hat and silver or gold-rimmed glasses. I asked her if she knew who he was, and she said she never saw him before in her life." N.T. 4/6/88, 85.

**Closings**

166.    The parties' closing arguments each centered around Morales. Each offered explanations for Morales' recantations.

167.    The defense argued that Morales implicated Turner because Detective Piree started focusing his questioning on her and that she cooperated with the prosecution because she wanted to get out of custody and resolve her other cases. *Id.* at 96.

168.    Defense counsel highlighted her lack of credibility and the fact that she was an admitted liar. *Id.* at 99.

---

examination of ADA Buba regarding the contents of her memo as his "complaining" that he "couldn't effectively cross-examine because there is not a longer memorandum." *Id.* at 57.

31

169.     The defense pointed out the inconsistencies between Morales' initial description of the perpetrator and Turner's appearance at arrest. *Id.* at 103. Counsel also argued that the Medical Examiner's findings regarding the trajectory of the bullet that killed Martinez were not consistent with Morales' account of the shooting. *Id.* at 100.

170.     Summing up the Commonwealth's evidence, defense counsel said "it really comes down to Rosa. Can you accept the word of that woman in order to convict him of murder and possession of an instrument of crime?" *Id.* at 114.

171.     The Commonwealth also attempted to explain why Morales was inconsistent, arguing that Morales had conflicting motivations. According to the prosecution, Morales wanted to cooperate to vindicate her partner but also did not want to cooperate in order to protect herself from the threats she had received. *Id.* at 127-28. However, the Commonwealth also argued that "she was a witness, again, who had very insignificant ties to law enforcement or interest in the community well-being, and she had every interest to fear him." *Id.* at 147-48.

172.     The Commonwealth generally tried to paint Morales as a product of her environment using this inflammatory analogy to gloss the Commonwealth's case while likening Turner to the devil:

> Now, ladies and gentleman, if a crime such as murder is committed in a monastery there are holy men who would come forward to testify as to what happened with regards to that crime. But when, an expression I think may be well-known to you, when a crime is committed in such a circumstance as this, when you must prosecute the devil, you often have to go to hell for your witnesses. Now, I suggest to you, ladies and gentlemen, that the world that Rosa Morales lives in is about as close to hell as we know on earth. And she must be regarded in light of the world that she comes from.

*Id.* at 123.

173.     The Commonwealth also characterized Morales as "a very brave young woman." *Id.* at 134.

32

174.    At the conclusion of the Commonwealth's closing, the defense moved for a

mistrial on eleven grounds related to the Commonwealth's closing argument, including that

ADA Foulkes likened Turner to the devil, while she characterized Morales as "a very brave

woman"; argued for sympathy for Morales by twice referencing that she was pregnant with

Martinez's child when he died, although this fact was not in evidence; commented on Turner's

post-*Miranda* silence; placed an unconstitutional burden on the defense by telling the jury the

defense was raising inconsistent defenses, and therefore did not want to get to the truth; and the

totality of the Commonwealth's argument.. *Id.* at 160-75. The Court denied the motion. *Id.*

175.    The following morning, the defense renewed its mistrial motion based on ADA

Buba's testimony, now citing a pending Pennsylvania Superior Court Case and the Pennsylvania

Rules of Professional Conduct. The court again denied the motion. N.T. 4/7/88, 1-18.

### Deliberations

176.    Jury deliberations began around noon on April 7, 1988. A few hours into

deliberations the jury asked to see four documents: a transcript of ADA Buba's testimony;

Turner's police statement; Morales' testimony; and Morales' first statement to Detective Piree.

*Id.* at 53-54. The court sent back a note asking for clarification regarding the jury's disagreement,

and it sent another note asking for Morales' police statement, Turner's police statement, and the

notes of Morales' testimony. *Id.* at 56.

177.    Next, the jury asked for Morales' testimony to be read back. *Id.* at 55.

178.    The court brought the jury back to discuss its questions. The judge admonished

the jurors that they needed to rely on their independent recollections of Morales, noting that she

was "the key witness in the case." *Id.*

179.    Citing the Rules of Criminal Procedure, the judge declined to provide the jury

with Morales' testimony. *Id.* at 57.

180.     The jury sent a final note on the afternoon of April 7, 1988: "Your Honor, we seem to be hopelessly deadlocked. People are not going to change their minds." *Id.* at 58.

181.     The defense again moved for a mistrial or, in the alternative, for the jury to be re-instructed. The Court denied both requests. *See* 4/26/88 Post-Verdict Motions (PCRA Pet'n Exhibit 28) at 2-3.[11]

182.     Over the defense's objection, the Court sequestered jurors for the night and sent them to their hotel.

183.     According to defense counsel, after the deadlock, the Court persuaded the Commonwealth to offer Turner a plea deal. The Commonwealth offered him a deal of 5-10 years with credit for time served. Turner declined that offer. *See* George Newman Certification (PCRA Pet'n Exhibit 29).

184.     Deliberations began again at 9:30 a.m. the following morning, and the jury returned a verdict of guilty on second-degree murder and possessing instruments of crime at 11:43 a.m. *See* N.T. 11/30/88, 6.

185.     On April 8, 1988, the court sentenced Turner to life on the count of second-degree murder and suspended a sentence for possession of an instrument of crime. *Id*. at 2.

### NEW EVIDENCE UPON WHICH THIS PETITION IS BASED

186.     Turner and his counsel knew at the time of Turner's trial about Morales' varying statements, her drug use, and the immunity granted Morales for her testimony. What Turner and his counsel did not know, and could not have known until the Commonwealth's recent

---

[11]     The prosecutor submitted an affidavit following the trial stating that she had no memory of Newman requesting that the jury be re-instructed. N.T. 11/30/88, 10. For reasons that are unknown, the Court closed the record on April 7, so the proceedings on April 8 were not transcribed.

disclosures, was that, when she was interacting with the police and the District Attorney's Office, Morales was suffering a mental health crisis, even to the extent of having suicidal ideations. These circumstances, and the Commonwealth's conduct in response to Morales' condition, have been hidden until now, and are the foundation of this Petition.

187.    At Turner's preliminary hearing the Commonwealth disclosed that Morales had been charged as an absconding witness for hiding from the police and stating that she intended to run away to New Jersey to avoid testifying. However, the full details of Morales' flight, and the police's interactions with her leading up to the preliminary hearing, were not known until the Commonwealth disclosed the Philadelphia Police Department's Homicide File (H-File) and the District Attorney's Office File ("DAO File) to Turner in May 2023.

188.    On February 5, 1987, not even two days after the police dropped Morales back at her apartment, they returned to find that she had suddenly moved out. *See* 2/2/87 PPD Activity Sheets (DT (HF) 000337) at 2. Rafael Lopez, the building's owner, told Detectives Bova and Hoffner that Morales had moved out on Wednesday, February 4, and did not return to pick up her belongings. *Id.*

189.    After Detectives Bova and Hoffner left, Lopez located a note that Morales had left in the apartment. Police took Lopez to the Homicide Division where he turned over a suicide note that Morales wrote and addressed to her mother "Norma." *See* Morales' Suicide Note (DT (HF) 000295-99) (PCRA Pet'n Exhibit 30).

190.    The note reads: "Dear Mom, I'm writing to tell you, good [bye] I think is time for me, to kill myself. I just what you to do me a favor, and tell my kid the I didn't give them up for my freedom it was because I didn't have no where to go with them. I love them but I was to young didn't know what I was doing and I kill myself because if I couldn't give them no love I

know I was not going to get none back. I allway's felt like my family didn't love me so I left what I had to love I wish I known what was love. Please do for my kid's what I couldn't for them. Love all Goodbey. Died Rose." *Id.*

191.    The note concludes with an illustration of Morales hanging.



192.    Detectives Hoffner and Starr searched for Morales in several locations where she was known to stay or to engage in prostitution. *See* 2/12/87 PPD Activity Sheets (DT (HF) 000356-58) (PCRA Pet'n Exhibit 31).

193.    Detectives then went to Morales' mother's house and spoke to Norma Torres. Torres told the detectives that she had not heard from or seen Morales since before the shooting and that she did not know where she was. *Id.* at 2.

194.    As stated above, Morales did not appear at Turner's preliminary hearing on February 11, 1987.

36

195.    That night, Torres called the police and said that she knew where Morales was staying. At 5:30 a.m. on February 12, the police went to 2910 N. Leithgow Street and found Morales sleeping on the couch. *Id.* at 3.

196.    Police arrested Morales and brought her to the Homicide Division where she was strip searched. While in custody she made comments that she planned to commit suicide. *See* 2/12/87 PPD Memorandum (DT (HF) 000241) (PCRA Pet'n Exhibit 32).

197.    Morales also stated that she did not want to testify and that if released she would go to New Jersey to avoid testifying. *See* 2/12/87 Investigation Interview Record of Rosemary Morales; [12] *see also* 2/12/87 PPD Activity Sheets (DT (HF) 000358) at 2. She also stated that when the police returned her to her apartment around 1:30 a.m. on February 2, there was a man waiting for her inside who threatened to kill her if she testified. *See* 2/12/87 Investigation Interview of Record of Rosemary Morales 2-3.[13]

198.    Police learned that Morales had two outstanding bench warrants under the name "Rosa Carmona." 2/12/87 PPD Activity Sheets (DT (HF) 000358) at 3.

199.    Morales also had a detainer from a probation violation. *See* Probation Department Detainer (DT (HF) 000360) (PCRA Pet'n Exhibit 33).

200.    Morales was then arraigned and served with an arrest warrant for default of required appearance, and absconding witness, both misdemeanors. *See* 2/12/87 Warrant for Arrest of Rosemary Morales (DT (HF) 000222-27) (PCRA Pet'n Exhibit 34).

201.    The Philadelphia Police Department did all it could to ensure that Morales was not released from custody. At her arraignment, the district attorney made a "High Bail Request"

---

[12]    This was disclosed before trial.

[13]    There has never been any contention that this man was David Turner as he was in custody at this time. Morales never identified or described this person aside from stating that he

and a request for a psychiatric examination. The court was apparently notified that Morales had recently and repeatedly stated that she was going to commit suicide. *See* 2/12/87 PPD Activity Sheets (DT (HF) 000359) at 3; *see also* 2/12/87 Municipal Court Hearing List (DT(HF) 000285) (PCRA Pet'n Exhibit 35); Detainer (DT (HF) 000360).

202.  The police were aware that Morales had threatened suicide. On February 12, Detective Hoffner wrote a memo, which was approved by the Captain of the Homicide Division, stating "all personnel who process Rosemary Morales PP#638831 should be made aware of the fact that while in police custody she made remarks that she was going to commit Suicide. Request that this prisoner be treated accordingly." 2/12/87 PPD Memorandum (DT (HF) 000241).

203.  Morales was placed on suicide watch and detained in custody until she could testify at Turner's preliminary hearing.

204.  Before trial the Commonwealth disclosed only that Morales had been charged as an absconding witness and that she stated that she planned to flee to New Jersey to avoid testifying because she had been threatened. N.T. 4/6/88, 6-7.

205.  On May 1, 2023, the Philadelphia District Attorney's Office disclosed the H-File to Turner's counsel. The file contained exculpatory material that was previously undisclosed.

206.  Specifically, the H-File contained significant pieces of evidence discussed above regarding Morales' mental state, credibility, and contacts with law enforcement, including

---

was a black man. No one, including David Turner, was ever charged with intimidating Morales.

evidence regarding a potential suicide attempt and suicidal remarks Morales made to police,

necessitating her placement on suicide watch:

     a.  Rosemary Morales' four-page suicide note, obtained by the police from Rapheal

        Lopez after Morales left it in her apartment when she suddenly moved out on

        February 4, 1987. *See* Morales' Suicide Note.

     b.  The February 12, 1987 Philadelphia Police Department Memorandum written by

        Detective Hoffner stating "all personnel who process Rosemary Morales

        PP#638831 should be made aware of the fact that while in police custody she

        made remarks that she was going to commit suicide." 2/12/87 PPD Memorandum

        (DT (HF) 000241).

     c.  PPD Activity Sheets from February 5 and 12, 1987 detailing Morales'

        disappearance and police attempts to locate her. These activity sheets state that

        when Morales was arrested "she was abusive to the police and stated that when

        the police got done talking with her, she was going to Camden NJ and was not

        going to testify against David. She stated that she was going to commit suicide."

        *See* 2/2/87 PPD Activity Sheets at 13, 2/12/87 PPD Activity Sheets at 3. The

        Activity Sheets also state that Morales was transported to Homicide and was

        "strip searched by the police matron in the detention unit." *Id.* Morales was served

        with her outstanding detainers and bench warrants, and during her arraignment on

        February 12, the prosecutor requested high bail and a psychiatric examination.

        Finally, "a memo was attached to the defendant's paperwork indicating her recent

        remarks that she was going to commit suicide." *Id.* at 4.

    d.  February 18, 1987 Municipal Court Hearing List with the notation "see attached

        suicide watch." Municipal Court Hearing List.

    e.  Copies of Morales' probation detainer with "Suicide Watch" handwritten and

        circled. *See* Detainer.

207.    On May 8, 2023, the Commonwealth disclosed the DAO File to Turner's counsel.

That file contained:

    a.  A copy of the February 12, 1987 PPD Memo from Detective Hoffner stating that

        Morales had made suicidal remarks while in custody and requesting that she be

        treated accordingly. *See* PPD Memo (DT (DAO) 000198) (PCRA Pet'n

        Exhibit 36).

    b.  A memorandum from ADA Andrea Foulkes to her supervisor ADA Ray Harley

        requesting permission to seek the death penalty against Turner, dated March 29,

        1988. *See* 2/29/88 Memo From ADA Foulkes. That memo states:

> Given the outrageous circumstances of the killing, threats to the
> witness which succeeded in causing her to refuse to cooperate with
> the prosecution and the one aggravating circumstance of the
> defendant's prior record, I request approval to seek the death penalty
> in this case.

        *Id.* at 2.

    c.  A return memo from ADA Harley sent a memo back to ADA Foulkes with a note

        stating, "denied after discussion with ADA Loy." Note from ADA Ray Harley.

208.    Turner's trial attorney George Newman made a discovery demand under the

Pennsylvania Rules of Criminal Procedure for exactly the type of information contained in the

H-File and DAO File:

> Any and all other records and/or information which arguably could be helpful or
> useful to the defense in impeaching or otherwise detracting from the probative force
> of the Commonwealth's evidence or which arguably could lead to such records or

information, including, but not limited to: any and all scientific, hospital, medical, psychiatric, psychological, social work, mental health, drug and/or alcohol, pre-sentence investigation or other reports which tend to reflect on the credibility or competence of any of the prospective witnesses for the Commonwealth.

*See* 3/24/87 Letter from Newman to Discovery Unit (DT (DAO) 000698-702) (PCRA Pet'n Exhibit 37) at 2.

209.    Despite this clear demand and its constitutional obligation to provide exculpatory and impeaching material even without a discovery request, the Commonwealth did not disclose any of this material to Turner before 2023. The cover letter itemizing the documents provided before trial does not mention any of the documents detailed above. *See* 4/7/87 Discovery Letter (DT (DAO) 000697) (PCRA Pet'n Exhibit 38).

210.    Newman also does not remember being provided with any of the above-detailed information. In particular, he was never informed that Morales was suffering from a mental health crisis. Had he known that fact, he would have used it at trial. *See generally* George Newman Certification.

### CLAIMS FOR RELIEF

**CLAIM 1:    THE COMMONWEALTH VIOLATED TURNER'S FEDERAL DUE PROCESS RIGHTS BY SUPPRESSING ROSEMARY MORALES' SEVERE MENTAL HEALTH CRISIS**

211.    The Antiterrorism and Effective Death Penalty Act (AEDPA) provides relief to a petitioner "in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

212.    The federal constitution guarantees due process of law to criminal defendants. U.S. Const. amends. V & XIV.

213.    Due process requires the prosecution to disclose material evidence favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

214.    There are three elements to a *Brady* claim: (a) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (b) the government must have suppressed the evidence, whether intentionally or inadvertently; and (c) the suppressed evidence was material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see also Dennis v. Sec'y, Pa. Dep't Corr.*, 834 F.3d 263, 284-85 (3d Cir. 2016) (*en banc*).

215.    To establish materiality, a petitioner "need not show that he 'more likely than not' would have been acquitted if the new evidence was admitted." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (*per curiam*). Rather, evidence is material "when there is any *reasonable* likelihood it could have affected the judgment of the jury." *Id.* (emphasis added) (citations and internal quotation marks omitted); *see also, e.g.*, *Dennis*, 834 F.3d 263, 285 (3d Cir. 2016) ("The touchstone of materiality is a reasonable probability of a different result." (internal quotations and citations omitted)). "The adjective is important." *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*; *see also Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013). It follows that a petitioner can still prevail even if "the undisclosed information may not have affected the jury's verdict." *Wearry*, 577 U.S. at 392 n.6.

216.    The *Brady* materiality standard is co-extensive with *Strickland* prejudice. *See Marshall v. Hendricks*, 307 F.3d 36, 53 (3d Cir. 2002). *Strickland* prejudice is established, like *Brady* materiality, by a showing of less than a preponderance of the evidence. Because a reasonable probability is one "sufficient to undermine confidence in the outcome," *Strickland v. Washington*, 466 U.S. 668, 694 (1984), the *Strickland* prejudice standard is not "stringent"; it is, in fact, "less demanding than the preponderance standard," *Jermyn v. Horn*, 266 F.3d 257, 282

(3d Cir. 2001); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) ("[*Strickland*] specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered.").

217.   In assessing materiality, the Court does not examine the impact of each piece of suppressed evidence. Rather, the impact of the suppressed exculpatory evidence is viewed cumulatively. *Kyles*, 514 U.S. at 419 ("stressing" that materiality is considered "*collectively, not item by item*" (emphasis added)); *see also Dennis*, 834 F.3d at 360; *Johnson*, 705 F.3d at 129.

218.   Here, the Commonwealth's suppression of material exculpatory and impeachment evidence in the H-File and DAO file violated Turner's federal and state due process rights in violation of *Brady* and its progeny.

219.   *First*, the evidence was both exculpatory and impeaching because it impeaches Morales' credibility and sheds light on her interactions with law enforcement in a new way. It directly contradicts the Commonwealth's theory that Morales was unreliable because she was threatened, and instead provides the defense a new theory, which was unavailable at trial, that she was unreliable because she was suffering a serious and catastrophic mental health crisis at the time that she identified Turner.

220.   *Second*, this information was suppressed. The documents supporting this claim were contained in the H-File and DAO-File produced in May 2023. They were not disclosed before trial, despite trial counsel's specific request for such evidence. *See* 3/24/87 Letter from Newman to Discovery Unit at 2; 4/7/87 Discovery Letter; *see also* George Newman Certification.

221.   *Third*, there is no question that the undisclosed evidence regarding Morales' mental state is material.

222.     According to the trial court, Morales was "the key witness in the case." N.T.

4/7/88, 55. Her credibility and her various communications and interactions with the police were

the central issues at trial.

223.     During the time period that Morales identified Turner to police through varying

accounts of the crime, she was suffering from a mental health crisis so severe that she wrote a

suicide note to her mother, required being placed on suicide watch while in custody, and was

ordered by the Municipal Court to have a psychiatric examination. Turner would have been able

to use these facts to cross examine Morales. *See Wilson v. Beard*, 589 F.3d 651, 666 (3d. Cir.

2009) (suppressed evidence of a witnesses' mental health condition was material where it

undermined their reliability); *Cohen v. Albert Einstein Med. Ctr.*, 592 A.2d 770, 726 (Pa. 1991)

("Evidence of mental illness or a disability which impairs a witness's ability to perceive,

remember and narrate perceptions accurately is invariably admissible to impeach credibility.");

*see also United States v. Georgiou*, 777 F.3d 125, 141 (3d Cir. 2015) ("A witness's credibility

may always be attacked by showing that his or her capacity to observe, remember, or narrate is

impaired. Consequently, the witness's capacity at the time of the event, as well as at the time of

trial, is significant." (quoting Weinstein's Federal Evidence § 607.05[1] (Joseph McLaughlin ed.,

2d ed. 2014))); *Commonwealth v. Davido*, 106 A.3d 611, 637 (Pa. 2014) ("[W]hen a witness

suffers from a mental disability relevant to his or her ability to accurately observe, recall or

report events, the jury must be informed of the disability in order to assist it in properly assessing

the weight and credibility of the witness's testimony.").

224.     The defense also could, and would, have used this evidence to counter the

Commonwealth's argument that Morales was unreliable because she had been threatened,

instead showing that she was unreliable because she was suffering from an acute mental health crisis. *See* George Newman Certification.

225.    Moreover, the suppressed evidence provides information about Morales' interactions with law enforcement that was otherwise unavailable to Turner before trial. Had Turner been aware of these facts before trial, he could have cross-examined not only Morales, but also Detectives Piree, Bova, Hoffner, and Starr, and ADA Buba about their interactions with Morales between February 3 and 26, 1987. *See Goodwin v. Wetzel*, No. 18-CV-5269, 2022 WL 2759047, at *14 (E.D. Pa. June 15, 2022) (evidence of detective's "improper interrogation tactics and lack of credibility provides a reasonable basis to question the verdict rendered by the jury"), *R&R adopted*, No. CV 18-5269, 2022 WL 2757702 (E.D. Pa. July 14, 2022). The suppressed evidence showed repeated and high-pressure interactions between Morales and law enforcement in the midst of a dire mental health crisis. *Brady* evidence is material where it can be used to impeach the police investigation. *See Dennis*, 834 F.3d at 313.

226.    The suppression of this critical information denied defense counsel an opportunity to investigate and effectively cross-examine the key witnesses at trial and to develop his trial strategy. Thus, the jury was prevented from fully assessing the credibility of Morales and the law enforcement witnesses. There is a reasonable probability of a different outcome where, as here, defense counsel was denied information that directly undermined the reliability of a key witness'—here the only witness—testimony and the police investigation. *See id.* at 311 ("Alterations in defense strategy and cross-examination at trial are precisely the types of qualities that make evidence material under *Brady*."); *cf. Simmons v. Beard*, 590 F.3d 223, 238-39 (3d Cir. 2009) (discussing the different trial decisions defense counsel could have made if *Brady* material was properly disclosed).

227.    The jury was already deadlocked, and, based on its questions to the court, struggled with Morales' testimony. Had the jury known that she was in crisis to the point of being placed on a suicide watch when she identified Turner, it surely would have evaluated her testimony differently.

228.    Finally, although Morales' credibility was impeached at trial, the suppressed material is not cumulative of the impeachment offered at trial. The new impeachment evidence is of a fundamentally different character than the impeachment evidence available at trial—it is affirmative evidence that calls into question Morales' mental state, her ability to perceive and remember events, and her susceptibility to coercion by law enforcement. This evidence goes to a different point than the trial evidence because it impugns her mental state at the time she identified Turner. To the extent this evidence borders themes explored by defense counsel at trial, namely Morales' motivations for cooperating, this evidence is of a higher grade than the evidence available to Turner at his trial in that it is actual evidence showing the depth of Morales' interactions with police, and her unique vulnerability to coercion at that time, rather than speculation to that effect. *See Johnson*, 705 F.3d at 129 ("[U]ndisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration." (citing *Rocha v. Thaler*, 619 F.3d 387, 397 (5th Cir. 2010)).

**CLAIM 2:    TURNER IS ENTITLED TO RELIEF BECAUSE PROSECUTORIAL MISCONDUCT SO INFECTED THE FAIRNESS OF HIS TRIAL AS TO VIOLATE HIS RIGHT TO DUE PROCESS**

229.    In addition to the suppression of evidence discussed above, the trial prosecutor's misconduct also requires relief. To constitute a due process violation, prosecutorial misconduct must be significant enough that it results in the denial of the right to a fair trial. *See Greer v. Miller*, 483 U.S. 756, 765 (1987); *see also Marshall v. Hendricks*, 307 F.3d 36, 67 (3d Cir. 2002)

(stating that prosecutorial misconduct "becomes constitutional error when the *impact* of the misconduct is to distract the trier of the fact and thus raise doubts as to the fairness of the trial" (emphasis in original)).

230.   The touchstone of this analysis, therefore, is "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982); *see also United States v. Agurs*, 427 U.S. 97, 110 (1976) ("[I]f the suppression of the evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). Thus, for instance, where the Government "systematically inject[s] inadmissible . . . evidence" at trial, it "permeates the proceedings with prejudice." *United States v. Morena*, 547 F.3d 191, 194, 196 (3d Cir. 2008).

231.   The court "must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001). This analysis proceeds in two steps:  "First, [the court] consider[s] whether there was misconduct. 'If so, [it] proceed[s] to determine whether that misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process,"' taking into account the entire proceeding." *United States v. Welshans*, 892 F.2d 566, 574 (3d Cir. 2018) (quoting *United States v. Repak*, 852 F.3d 230, 259 (3d Cir. 2017)).

232.   Without question, Turner's trial was unfair because of the actions and omissions of the Commonwealth.

233.   *First*, Turner was deprived of critical exculpatory material that directly contradicted the Commonwealth's theory that Morales was unreliable because she had been threatened. He was deprived of impeachment material showing that the sole eyewitness was

47

undergoing a serious mental health crisis when she identified him as the perpetrator, despite his counsel's explicit demand for it.

234.    *Second*, the Commonwealth used the empty threat of the death penalty to convince Mr. Turner to "enthusiastically" waive a cognizable motion to suppress. *See* N.T. 3/30/88, 2-3. At the moment that the parties put this agreement on the record in open court, the prosecutor did not have permission from her supervisors to pursue the death penalty, and, in fact, authorization to proceed was denied on the same day. *See* Note From ADA Ray Harley. As stated on the record, the consideration Turner received for dropping his meritorious suppression motion—especially with respect to Morales' statements—was the Commonwealth giving up its right to pursue the death penalty in the case.  This risk turned out to be illusory, and the prosecutor engaged in misconduct by threatening it.

235.    *Third*, the Commonwealth improperly vouched for Morales' credibility, despite knowing that she had significant mental health issues. In closing, the prosecutor told the jury that Morales did not lack credibility, but instead was testifying as "a very brave young woman." N.T. 4/6/88, 134.

236.    *Fourth*, the Commonwealth impermissibly likened Turner to "the devil" during closing argument. *Id.* at 123.

237.    Each of these instances undermined the fundamental fairness of Turner's trial, but the cumulative effect is undeniable. Whether the prosecutor's actions were designed to provoke Turner to move for a mistrial or not, they certainly had that effect:  defense counsel made three separate motions for a mistrial during this trial.

**CLAIM 3:     TURNER IS ENTITLED TO RELIEF BECAUSE THE CUMULATIVE IMPACT OF THE
CONSTITUTIONAL VIOLATIONS AT HIS TRIAL RENDERED IT FUNDAMENTALLY
UNFAIR, VIOLATING HIS DUE PROCESS RIGHTS UNDER THE UNITED STATES
CONSTITUTION.**

238.     Even if this Court decides that Turner is not entitled to relief based on any

individual constitutional claim for lack of prejudice, it should grant him relief because the

cumulative impact of the constitutional errors rendered his trial fundamentally unfair, violating

his right to due process. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) ("The test . . .

is whether the error had substantial and injurious effect or influence in determining the jury's

verdict." (internal quotation marks and citations omitted)); *Albrecht v. Horn*, 485 F.3d 103, 138-

39 (3d Cir. 2007) ("[W]e recognize that errors that individually do not warrant habeas relief may

do so when combined.").

239.     Considered in the aggregate, the suppressed evidence of Morales' mental health

crisis, the fact that the death penalty was not available to the Commonwealth, and the other

instances of prosecutorial misconduct caused overwhelming prejudice to Turner. The result of

these due process violations was a trial that was unfair, and in which Turner was unable to

adequately defend himself. The cumulative effect of the due process violations requires a new

trial.

**CLAIM 4:     TURNER IS ENTITLED TO RELIEF UNDER THE UNITED STATES CONSTITUTION
BECAUSE IT PROHIBITS THE INCARCERATION OF ONE WHO IS ACTUALLY
INNOCENT**

240.     A claim of actual innocence may be a cognizable and free-standing basis for relief

under the Eight and Fourteenth Amendments to the United States Constitution. *See Herrera v.

Collins*, 506 U.S. 390, 406 (1993) (outlining what a freestanding actual innocence claim, not one

tied to underlying constitutional error at trial, would require and evaluating petitioner's claim of

actual innocence on its merits); *see also In Re Davis*, 557 U.S. 952, 557-58 (2009) ("[D]ecisions

49

of this Court clearly support the proposition that it would be an atrocious violation of our

Constitution and the principles upon which it is based to execute an innocent person." (internal

quotation marks omitted)).

241.   Accordingly, this Court should recognize a freestanding claim of actual innocence

under the Federal Constitution. Federal courts have never articulated the precise burden of

proving a right to relief on a freestanding innocence claim but have indicated that it is

"extraordinarily high." *Herrera*, 506 U.S. at 391.

242.   There is such clear and convincing evidence of Turner's innocence here that it

satisfies the "extraordinarily high" burden pondered in *Herrera*.

243.   Most fundamentally, there is no reliable evidence that ties Turner to this crime,

including no physical or forensic evidence.

244.   The single piece of evidence inculpating Turner was Morales' eye witness

identification. Morales' credibility as a witness was questionable at trial, but with the recent

discovery that she was suffering an acute mental health crisis at the time she implicated Turner,

there simply is no credibility to her testimony.

245.   Even if Morales was a credible witness, it is now well-recognized that eyewitness

identification, even under ideal circumstances, can be highly unreliable. *See, e.g.*, *Dennis*, 834

F.3d at 313-16 (McKee, C.J., concurring)*see generally* Third Circuit Task Force, *2019 Report on

Eyewitness Identifications*, 92 TEMPLE L. REV. 1 (2019) (describing the various factors pertaining

to a witness's circumstances and the identification procedures used by police that impact the

accuracy of an eyewitness identification); *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014)

("Because eyewitnesses can offer inaccurate, but honestly held, recollections in their attempt to

identify the perpetrator of a crime, eyewitness identifications are widely considered to be one of the least reliable forms of evidence.").

246.    Here, Morales admitted to freebasing cocaine shortly before she heard the shooting, and admitted she identified Turner by the sound of his voice, which courts have acknowledged goes directly to credibility and reliability of perception. *See DiJoseph v. Vuotto*, 968 F. Supp. 244, 249 (E.D. Pa. 1997) ("Drug use goes directly to the issue of DiJoseph's credibility and perception of the incidents as they occurred on the date of the shooting."). The conditions of the scene certainly support the idea that she could not have reliably identified the perpetrator—the hallway was dimly lit, she hid behind the door, and Martinez and the shooter fled up the stairway and out of her view.

247.    No other witness implicated Turner, and no physical evidence connects him to this crime, the scene, or the victim.

248.    Because there is no reliable evidence that Turner committed this crime, he satisfies the burden for a claim of actual innocence under the United States Constitution.

### ALLEGATIONS PURSUANT TO 28 U.S.C. § 2244

249.    To file a successive petition for writ of *habeas corpus*, a petitioner must demonstrate that he has alleged "a *prima facie* showing that the application satisfies the requirements," 28 U.S.C. § 2244(b)(3)(C), that:

> (i) The factual predicate of the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) The facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B).

51

250.    The prima facie showing is a modest one. It requires only "a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997); *see Goldblum v. Klem*, 510 F.3d 204, 219 (3d Cir. 2007) (adopting the meaning of "*prima facie* showing" discussed in Bennett). "Due diligence does not require the maximum feasible diligence," rather, it only requires "reasonable diligence in the circumstances." *Schlueter v. Varner*, 384 F.3d 69 (3d Cir. 2004); *see also Wilson v. Beard*, 426 F.3d 653, 660-61 (3d Cir. 2005).

251.    As in any context where a court determines the evidence of a *prima facie* showing, credibility determinations should not be attempted at this stage. *See Johnson v. California*, 545 U.S. 162, 171 n.7 (2005) (assessment of *prima facie* showing under *Batson v. Kentucky* "'can involve no credibility assessment' because 'the burden-of-production determination necessarily precedes the credibility-assessment stage'"). Rather, they are left to the District Court after an appropriate evidentiary hearing.

252.    As articulated throughout this petition, Turner satisfies § 2244(d)(2)(B)(i) in that the facts presented herein could not have been previously discovered through the exercise of diligence.

253.    Due diligence is fact-specific and must be determined case-by-case.

254.    When this analysis is conducted, the Court's jurisdiction over this petition is clear. In combination with, and independently of, Turner's pursuit of relief from his conviction through both the state and federal courts, Turner has diligently attempted to ascertain facts to prove his innocence throughout his thirty-five-year term of incarceration.

255.    Despite the obstacles that Turner has faced in obtaining this withheld evidence and retaining counsel, Turner was ultimately able to secure the assistance of the Pennsylvania

Innocence Project in 2012. Yet, the Commonwealth still did not disclose the existence of its withheld files until May 2023.

256.    Under these particular circumstances, Turner exercised the requisite diligence in attempting to ascertain facts to prove his innocence and obtain the new evidence: the documents he sought and ultimately obtained were suppressed by the Commonwealth and Turner had no reason to believe these facts existed. *See Dennis*, 834 F.3d at 290.

257.    The facts underlying Turner's claim in light of the evidence as a whole are sufficient to establish by clear and convincing evidence that, if Turner was properly given access to exculpatory and impeaching information in the prosecution's possession, as required by *Brady v. Maryland*, no reasonable factfinder would have found him guilty of the offenses at issue here.

## REQUEST TO HOLD PROCEEDINGS IN ABEYANCE

258.    The claims raised in this habeas petition are virtually identical to the claims raised by Turner his April 29, 2024 Pennsylvania (successor) state post-conviction petition. Turner's pending PCRA proceeding will either result in the award of relief to Turner, or the exhaustion of his claims and underlying facts.

259.    As Turner's state post-conviction proceedings are unresolved, he has not exhausted his state court remedies, and federal habeas review would be premature.

260.    Turner is compelled to seek the protection of the federal courts before exhausting state court remedies, however, because his failure to do so could forever bar him from obtaining federal habeas review of the claims he is currently litigating in state court. AEDPA has a one-year limitations period.

261.    Turner has pending in state court an application for State post-conviction or other collateral review with respect to the pertinent judgment or claim. Thus, if Turner could be certain that his currently pending state court application would be deemed "properly filed" within the

meaning of § 2244(d)(2), the AEDPA statute of limitations would be tolled by the pending state proceedings. Were that the case, Turner would have no reason to seek this Court's protection, and he would wait until after exhaustion of state remedies before seeking federal review.

262.    Turner and his counsel believe his state court proceedings are "properly filed." Given previous United States Supreme Court construction of the term "properly filed," however, that may not be determined until after the state courts rule. If the Commonwealth argues and the state courts agree that Turner's PCRA petition is untimely, then, under *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), Turner's state court application could be deemed improperly filed and the pending state court application would not toll AEDPA's limitations period. Turner therefore, must now seek federal review or risk the forfeiture of his federal claims altogether.

263.    Although there exists a strong argument that Turner would be entitled to equitable tolling of the AEDPA limitations period, if the courts rule that equitable tolling is not available in this case, Turner's failure to seek federal review now could result in forfeiture of his rights under federal law.

264.    The claims Turner raises are worthy of federal review and demonstrate that Turner should have his right to federal review preserved if relief does not come through the state petition. In the meantime, under the "suspense" or "abeyance" doctrines, the federal litigation would be stayed pending exhaustion in the state court.

265.    This petition, therefore, is filed within one year of the date the Commonwealth disclosed the H-file and the DAO's file on May 1 and May 8, 2023, although federal review is technically premature. Since state court remedies have not been exhausted, and because even a dismissal without prejudice in federal court could endanger Turner's right to seek federal review

54

after exhaustion, federal habeas proceedings should be held in suspense or abeyance pending the outcome of the state court proceedings.

## CONCLUSION AND REQUEST FOR RELIEF

For all of the above reasons and the attached affidavits and exhibits, Petitioner requests that the Court:

A.  Hold these proceedings in abeyance pending resolution of the state court proceedings;

B.  Upon reactivation of these proceedings, that the Court require the Commonwealth to respond to this Petition;

C.  Permit evidentiary development and discovery as needed for the resolution of Petitioner's claims; and

D.  Grant habeas corpus relief.

Respectfully submitted:

/s/ *Nilam A. Sanghvi*
Nilam A. Sanghvi (Pa. Atty. ID No. 209989)
THE PENNSYLVANIA INNOCENCE PROJECT
1515 Market Street, Suite 300
Philadelphia, PA 19102
(214) 204-4255
nilam.sanghvi@painnocence.org

Amelia Maxfield (Pa. Atty. ID No. 328736)
EXONERATION PROJECT
1712 N Street NW, Suite 401
Washington, DC 20036
(771) 221-0441
amelia@exonerationproject.org

Thomas W. Hazlett (Pa. Atty. ID No. 88052)
Emily Horwitz (Pa. Atty. ID No. 332141)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
hazlettt@ballardspahr.com
horwitze@ballardspahr.com

*Counsel for Petitioner David Turner*

Dated: May 1, 2024

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DAVID TURNER, | : |
| | : |
| Petitioner, | : |
| | : |
| v. | : |
| | : |
| JASEN BOHINSKI, Superintendent, State | :   NO. _____ |
| Correctional Institution at Dallas; MICHELLE | : |
| HENRY, Attorney General, Office of Attorney | : |
| General; LAWRENCE S. KRASNER, District | : |
| Attorney, Philadelphia County, Pennsylvania | |
| | |
| Respondent. | |

## ATTORNEY VERIFICATION

The facts in this Petition are true and correct to the best of undersigned's knowledge, information, and belief, and are verified subject to penalties for unsworn falsifications to authorities under Pennsylvania Crimes Code Section 4904 (18 Pa. C.S. § 4904). Counsel have been authorized to file this Petition on Petitioner David Turner's behalf. Due to Turner's location at SCI Dallas, counsel have not yet obtained a verification from Turner. A verification will be filed to support this Petition as soon as practicable.

                                  _/s/ Amelia Maxfield_____
                                    Amelia Maxfield, Esq.
                                    Date of Birth: 12/05/1987

Dated: May 1, 2024

# Appendix A

FILED
04/29/2024 09:58:24 PM
Post Trial Unit
By: K. JOH

## IN THE COURT OF COMMON PLEAS
## PHILADELPHIA COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| Respondent | : | |
| | : | |
| | : | CRIMINAL TRIAL DIVISION |
| | : | CP-51-CR-0304121-1987 |
| v. | : | |
| | : | |
| | : | |
| DAVID TURNER, | : | |
| Petitioner | : | |

### [Proposed] ORDER

AND NOW, on this _____ day of _____, 2024, upon consideration of Petitioner

David Turner's Petition for Post Conviction Relief, and the Commonwealth's response thereto, it is

hereby ORDERED AND DECREED that the Petition is GRANTED.

Mr. Turner's convictions and sentences in this matter are hereby VACATED.

BY THE COURT:

_____
Scott DiClaudio, J.

Amelia Maxfield
Pa. Atty. ID No. 328736
THE EXONERATION PROJECT
1712 N Street NW, Suite 401
Washington, DC 20036

Nilam A. Sanghvi
Pa. Atty. ID No. 209989
THE PENNSYLVANIA INNOCENCE PROJECT
1515 Market Street, Suite 300
Philadelphia, PA 19102

Thomas W. Hazlett
Pa. Atty. ID No. 88052
Emily Horwitz
Pa. Atty. ID No. 332141
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

*Counsel for Petitioner David Turner*

## IN THE COURT OF COMMON PLEAS
## PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA,  :<br>Respondent                      : <br>              : <br>              : <br>              : <br>        v.               : <br>              : <br>              : <br>DAVID TURNER,          : <br>Petitioner                : | CRIMINAL TRIAL DIVISION<br>CP-51-CR-0304121-1987 |

## PETITION FOR POST-CONVICTION RELIEF

TO THE HONORABLE SCOTT DiCLAUDIO, PRESIDING IN THE COURT OF COMMON
PLEAS CRIMINAL TRIAL DIVISION FOR THE COUNTY OF PHILADELPHIA:

Petitioner David Turner, through his *pro bono* counsel, files this Petition for Post-

Conviction Relief. Turner seeks vacation of his conviction and sentence based on due process

violations that were revealed when the Commonwealth disclosed its file and the Philadelphia

Police Department's Homicide File to counsel more than three decades after Turner's trial. For

the reasons set forth below, Turner's conviction for second-degree murder, and his sentence of

life without parole, should be vacated. In the alternative, and at minimum, the Court should

conduct an evidentiary hearing regarding Turner's claims.

## INTRODUCTION

1.     Turner's conviction for second-degree murder, and his subsequent life without parole sentence for the shooting death of Mario Martinez,[1] was always based on the thinnest of evidentiary reeds—the testimony of one eyewitness, Rosemary Morales,[2] who admitted at the time that she had been using drugs just before the shooting that killed her then-boyfriend. No other witness tied Turner to the crime. No physical evidence implicated Turner. Police never recovered the gun used to shoot the victim, and when Turner was arrested, his clothes did not match Morales' description, nor was there blood or gunshot residue on his shoes, clothes, or person.

2.     What has now been revealed is that the evidentiary reed of Morales' testimony— the only evidence on which the jury could have possibly convicted Turner, and in the words of the trial court "the key witness in the case"—was even thinner and more damaged than Turner or his prior counsel could have possibly known. Through a failure to disclose, as well as through affirmative misleading conduct, the Commonwealth hid from Turner and his former counsel that Morales was suffering a severe mental health crisis at the time of the incident and the subsequent investigation and prosecution, so much so that Morales was contemplating suicide. Authorities were so concerned about Morales' condition that they placed her under suicide watch in protective custody to secure her participation in Turner's preliminary hearing.

---

[1]     Martinez is referred to by several names in the files and trial transcripts, including Nelson Rivera, Nelson Diaz, and "Cheeno," or "Chino." For consistency with the trial record, except for quotations from witness testimony, this Petition refers to the decedent as Mario Martinez.

[2]     Morales used several names throughout the police investigation and trial, including Carmen Gonzalez, Rosa Diaz, and Rosa Carmona. For consistency with the trial record, this Petition refers to her as Rosemary Morales.

2

3.      These revelations about the true extent of Morales' mental and emotional

condition at the time go to the heart of the Commonwealth's prosecution of Turner. Morales'

credibility as an eyewitness was the key, indeed, the only, issue at Turner's trial. By withholding

the recently revealed information regarding Morales, the Commonwealth deprived Turner of

crucial information that could have been used to challenge Morales' identification of Turner as

the shooter and to impeach the police investigation. No reasonable person can have confidence in

Turner's conviction in light of these due process violations, and it should be vacated.

**STATEMENT OF FACTS**

**I.      MARIO MARTINEZ'S MURDER AND THE POLICE INVESTIGATION**

4.      On Monday, February 2, 1987, at 12:46 p.m., police received a report of a

shooting inside 426 West York Street in Philadelphia.

5.      The officers discovered Mario Martinez lying on his back on the second-floor

landing, with his feet on the stairs. A Hispanic woman was laying on top of him, sobbing. *See*

2/2/87 Investigation Interview Record of Officer William Sellers (attached as Exhibit 1). The

woman identified herself as "Rosa Diaz," and stated that the decedent was her boyfriend, who

had been shot. *Id.* at 2. Morales and Martinez were staying in rooms on the first floor of the

building.

6.      Martinez was at or near death when officers arrived, with his pupils fixed and

dilated and no pulse observed. N.T. 4/4/88, 35.

7.      Martinez was transported to the hospital and pronounced dead at 1:32 p.m. on

February 2.

A.    CRIME SCENE PROCESSING

8.       Officers observed blood drops on the third floor and in the hallway and a pool of blood on the second-floor landing where Martinez was found. 2/2/87 Investigation Interview Record of Officer William Sellers at 2.

9.       The Mobile Crime Scene Unit processed the scene for physical evidence. It recovered two projectiles from the scene. One was lodged in the kitchen door in the rear of the first floor; the other was in the wall of the bathroom just above the tub on the second floor. N.T. 4/4/88, 137. A third projectile was recovered from Martinez's body at autopsy. N.T. 4/5/88, 106-07. The three bullets were later identified as .38 caliber. *Id.*

10.      A pair of black leather gloves was found on the second floor. A folding knife had been placed on Martinez's chest. *Id.* at 137; *see also id.* at 47.

11.      The gloves tested positive for lead residue. The gloves and knife did not have blood on them. *Id.* at 121-25.

12.      No drugs were recovered from the scene or from Martinez's body.

B.    POLICE INTERVIEWS OF OTHERS AT THE SCENE

13.      The police interviewed several other occupants of 426 West York: Luis Julio, Georgia Julio. Daniel Vila, Andres Taveres, and Rafael Lopez.

14.      The statements of the other occupants were consistent: they were in their respective apartments and heard several gunshots and the sounds of running in the hallway but did not see anyone involved in the shooting. *See* 2/2/87 Investigation Interview Record of Luis Julio (attached as Exhibit 2) at 1-2; 2/2/87 Investigation Interview Record of Georgia Julio (attached as Exhibit 3) at 1; 2/2/87 Investigation Interview Record of Daniel Vila (attached as Exhibit 4) at 1-2; 2/2/87; Investigation Interview Record of Andres Taveres (attached as Exhibit 5) at 1-2; 2/2/87 Investigation Interview Record of Rafael Lopez (attached as Exhibit 6) at 1-2.

4

15. Vila and Taveres further stated that Martinez kicked the door to their third-floor apartment open and called for help before falling down the steps to the second floor. *See* Investigation Interview Record of Daniel Vila at 1-2; Investigation Interview Record of Andres Taveres at 1-2.

### C. ROSEMARY MORALES' CHANGING DESCRIPTION OF THE PERPETRATOR

16. On the scene, Morales gave police a number of different descriptions of the perpetrator and events leading up to Martinez's shooting:

- She said that she only heard the shots. *See* 2/2/87 Investigation Interview Record of Officer William Sellers.

- She then changed her account to say that she was with Martinez when he was shot and saw the shooter from the side. *See* 2/2/87 Investigation Interview Record of Officer Kenneth Brown (attached as Exhibit 7) at 2.

- She described the perpetrator as a black man, wearing a gray hat, green army jacket, blue jeans, and tannish brown boots. *Id.* at 1-2.

- She told some officers the shooter was wearing silver-rimmed glasses. *See* 2/2/87 Investigation Interview Record of Officer William Sellers at 2.

- She told several officers she had never seen the man before. *See* 2/2/87 Investigation Interview Record of Officer Jude McKenna (attached as Exhibit 8) at 2; *see* 2/2/87 Investigation Interview Record of Officer Christina Goodwin (attached as Exhibit 9) at 1. She told another officer that she could identify him if she saw him again. *See* 2/2/87 Investigation Interview Record of Officer Donald Woodruff (attached as Exhibit 10) at 1.

17. Importantly, Morales did not tell anyone at the scene that she had been threatened by the perpetrator.

### D. ROSEMARY MORALES' CUSTODIAL INTERVIEWS

18.     Rosemary Morales was transported to the Homicide Division and interviewed by Detective Jeff Piree[3] beginning at 2:30 p.m. Morales' initial interview with Detective Piree is documented in an eight-page police statement in question-and-answer format. The interview was not recorded. Detective Piree later said at trial that Morales' version changed from when he was not writing it down to when he began to do so. N.T. 4/5/88, 59. He testified that the entire interview lasted two hours, but activity sheets show that the interrogation lasted significantly longer. *Id.* at 65; *see also* 2/2/87 PPD Activity Sheets (DT (HF) 000325-38) (attached as Exhibit 11) at 1 ("[F]or the first five hours of the interview she continued to lie. However in the fifth hour she seen the light and began telling the truth.").

19.     Morales stated that she and Martinez had been "shacked up" for a year and living in the first-floor apartment for three days. *See* 2/2/87 2:30 p.m. Investigation Interview Record of Rosa Diaz (attached as Exhibit 12) at 1.

---

[3]     Detective Piree has a documented history of misconduct and has been involved in convictions where the defendant was later exonerated, including those of Chester Hollman and John Miller. Multiple lawsuits against Detective Piree allege serious misconduct including the suppression of exculpatory evidence. *See* Claudia Lauer, "Exonerated Philly man sues city over withheld evidence," *York Dispatch* (Mar. 17, 2021), *available at* https://www.yorkdispatch.com/story/news/2021/03/17/exonerated-philly-man-sues-city-witheld-evidence/115572518 (last accessed Apr. 24, 2024); *City and Chester Hollman Announce Settlement of Wrongful Conviction*, available at https://www.phila.gov/2020-12-31-city-and-chester-hollman-announce-settlement-of-wrongful-conviction/#:~:text=against%20the%20City.-,Mr.,was%20exonerated%20for%20in%202019 (last accessed Apr. 14, 2024); Chris Palmer, "He spent 22 years in prison for a murder he didn't commit. His lawsuit says Philly police detectives knew his case was flawed," *The Philadelphia Inquirer* (June 24, 2020), *available at* http://www.inquirer.com/news/philadelphia/john-miller-philadelphia-murder-exoneration-lawsuit-detectives-wrongful-conviction-20200624.html (last accessed Apr., 14, 2024); *see also John Miller III v. City of Philadelphia*; *Jeffrey Piree*, *William Coogan*, *Richard Bova*, *John Bell*, *and Michael Sharkey*, 2:20-cv-03054 (E.D. Pa.); *see also Donald Michael Outlaw v. City of Philadelphia*, *Jeffrey Piree and Howard Peterman*, 21-CV-01290 (E.D. Pa.).

6

20.     Morales stated that, before the shooting, Martinez had been outside with another individual, and she asked him through the window to go to the store and buy her juice. He returned from the store five minutes later, knocked on the door, and said that they did not have juice at the store. Morales said she heard one shot and opened the interior apartment door. She heard footsteps running up the stairs. She opened the door and saw a man from the back running up the stairway. *Id.* at 2, 4.

21.     Morales described that man as a black male, 30-35, 6 feet tall, 170 lbs., with black curly hair with gray on the sides; he was wearing an army jacket, "Sergio" jeans, and work boots. *Id.*

22.     Morales initially said that she was hiding behind the door while the shooting happened and did not emerge from her apartment until she heard the man run past. *Id.* at 3. She said that when she walked out, "Danny" from the third floor told her that Martinez had been shot. She found Martinez lying on his back in the stairway between the second and third floors. *Id.*

23.     Morales told Detective Piree that she used cocaine earlier in the day but was not under the influence at that time. *Id.* at 3-4.

24.     Detective Piree then asked a series of question that could have implicated Morales in the crime. Morales responded "no" or "I don't know" to each question. Then, without apparent prompting, she stated, "oh wait, Nelson had an argument with this guy Daule-Daole-the black guy I told you about today that ran up the stairs." *Id.* at 6.

25.     Morales then told Detective Piree that she observed Martinez and "Daule" having an argument on Friday night, around 11:00 p.m., at 4th and Diamond Streets.

7

26.     Morales proceeded to describe a much different scenario than in her earlier statements to police. Morales said she was in Rafael Lopez's apartment, freebasing cocaine, when Martinez knocked on the hallway door. She opened the door, and Martinez told her he had a bundle of "dope" and asked her to help him sell it. She declined but offered to hold it. Martinez got mad and began to walk out. "Daoul" entered the building and said he had $18.50 for a bag of drugs. Morales said Martinez told Daoul he could not sell it for that price, so Daoul reached into his pocket and pulled out a gun. Martinez ran up the stairs, and Daoul shot at him. The first time he missed, and they kept running up the stairs. Morales heard Martinez get to the third floor and then fall, and she heard two shots. Morales then said she saw Daoul run down the steps and, as he did, he pointed the gun at her and said, "bitch, if you tell, I kill you too." *Id.* at 6-7.

27.     Morales told Detective Piree that the person she identified as "Daoul" lived on Orianna, between Norris and Diamond. *Id.* at 7.

28.     Morales described Daoul as a black male, medium caramel complexion, 175-185 lbs., a little over 6 feet tall, black hair, clear face,[4] maybe 34-38; he was wearing "Sergio" faded jeans with blood on the right leg, work boots, a green army jacket, and a grey knit hat. *Id.* at 8. She also described Daoul's cousin "Bobby" as "short, chubby and big fat hands, dirty looking and scars on his face with black hair, 24-25 years old." She said that Daoul was wearing "Bobby's" jacket when he shot Martinez, which she knew because Bobby's name was written on it. *Id.*

---

[4]     The typed version of Morales' statement to Detective Piree uses the words "clear face," but handwritten notes in the homicide file from this interview say "clean face." Handwritten Notes (attached as Exhibit 13) (DT (HF) 000255). In the application for a search warrant for Turner's shoes, Detective Bova also uses this description. *See* Search Warrant (attached as Exhibit 14) (DT (HF) 000214-16).

29.     She also stated that she saw "Daoul" with a different gun on Friday at Bobby's house and that she knew he had .38's and a shotgun.

30.     At Turner's subsequent trial, Detective Piree described Morales' demeanor during this interview as "nervous, upset. She cried a few times. She was a little bit frightened. She was coherent, sober, aware of where she was, what we were talking about. She had full control of her faculties." N.T. 4/5/88, 56.

## II.     DAVID TURNER'S ARREST

31.     Following Morales' various statements to police, Detectives Hoffner, Campbell, Bova, and Piree "took to the streets" with Morales hiding in the back of an unmarked police car to find "Daoul." *See* PPD Activity Sheets; *see also* 2/2/87 9:35 pm Investigation Interview Record Rosemary Morales (attached as Exhibit 15).

32.     Eventually Morales pointed out "Bobby," supposedly "Daoul's" cousin, on the street. When Detective Piree exited his vehicle, Bobby began to flee. Detective Piree chased Bobby through a field, through a vacant lot, to the rear of a home, and into a house on the corner of Diamond Street west of Orianna.[5] N.T. 4/5/88, 52. According to Detective Piree, "there became a slight altercation inside the house. The male I was pursuing fled out the front of the house." *Id.* The police were not able to locate him.

33.     When Detective Piree returned to the vehicle following the failed effort to apprehend Bobby, Morales then pointed to a man standing on the sidewalk near 2051 N. Orianna and stated that the man was "Daoul." *Id.* The man Morales pointed to was David Turner, and he was arrested without incident.

---

[5]     "Bobby" was apparently never identified or interviewed but is described in the record as Bobby Wheeloss, Bobby Dollard, or Bobby Bey.

34.     When Turner was arrested, he was wearing black corduroy pants, a red shirt, a dark blue down jacket, a black/maroon knit cap, and brown boots. He was not wearing glasses. He was described by the police as 6'2", 195 lbs., medium complexion, brown eyes, dark brown hair, and well built. *See* Biographical Information Sheet (attached as Exhibit 16) (DT (HF) 000373-74). In his arrest photo, Turner had a beard. N.T. 4/5/88, 21. His nickname was recorded as "Dawud." *Id.*

35.     The police did not find any operable firearms, nor any clothing items matching Morales' description at 2051 N. Orianna. *Id.* at 32.

36.     Police also interviewed Deborah Leak who stayed at 2051 N. Orianna. She stated that she and Turner purchased drugs at 426 W. York Street but never from Martinez. *See* 2/12/87 Investigation Interview Record of Deborah Gean Leak (attached as Exhibit 17) at 3.

37.     Detectives Hoffner and Piree interviewed Turner at approximately 10:00 p.m. on February 2, 1987. He was advised of his *Miranda* rights and waived them. He denied shooting Martinez. *See* 2/2/87 Investigation Interview Record of David Turner (attached as Exhibit 18) at 1.

## III.     MORALES' FLIGHT, ABSCONDING CHARGES, AND THE PRELIMINARY HEARING

38.     Turner's preliminary hearing was originally scheduled for February 11, 1987. Morales did not appear. Detectives spoke to a friend of Morales who told them that Morales' grandmother had received a threatening phone call on February 4, stating that "if Rosa talks they would kill her." 2/5/87 Investigation Interview Record of Nilda Rodriguez (attached as Exhibit 19).

39.     On February 12, Morales was located at a friend's house, arrested, and charged with being an absconding witness. She gave a third police statement in which she said that she

10

did not want to testify and that, if released, she would go to New Jersey to avoid testifying. *See* 2/12/87 Investigation Interview Record of Rosemary Morales (attached as Exhibit 20). She also stated that when the police returned her to her apartment around 1:30 a.m. on February 2, there was a man waiting for her inside who threatened to kill her if she testified. *Id* at 2-3.[6]

40.　　When Morales failed to appear on February 11, the preliminary hearing was rescheduled for February 25, 1987. On that date, Morales refused to cooperate without a lawyer present and demanded her lawyer, Reuban Rodriguez. N.T. 4/6/88, 6.

41.　　On February 25, 1987, the Commonwealth, through District Attorney Ronald Castille, petitioned the court to grant immunity to Morales. The petition stated that Morales failed to appear at the original preliminary hearing date on February 11 and that she was "expected to refuse to testify on February 26, 1987 or at the next preliminary hearing listing on the basis of her privilege against self-incrimination." 2/25/87 Petition for Immunity (attached as Exhibit 21). The petition placed no limits on Morales' immunity aside from those codified in 42 Pa. C.S. § 5947, which states that the only crime which may be prosecuted with information derived under an immunity order is perjury. *See* 42 Pa. C.S. § 5947(d)(1).

42.　　The Court granted Morales general immunity on February 26, 1987. *See* Order for Immunity (attached as Exhibit 22).

43.　　Ultimately, Turner's preliminary hearing took place on February 26, 1987. ADA Barbara "Bashi" Buba represented the Commonwealth, attorney George Newman represented Turner, and Reuban Rodriguez represented Morales. Judge Louis Presenza presided. The Commonwealth called two witnesses, Rosemary Morales and Detective Piree. The parties

---

[6]　　There has never been any contention that this man was David Turner as he was in custody at this time. Morales never identified or described this person aside from stating that he was a black man. No one, including Turner, was ever charged with intimidating Morales.

11

stipulated that the Medical Examiner, Dr. Catherman, would testify that Martinez died from a single gunshot wound to the chest and that the manner of death was homicide. N.T. 2/26/87, 4.

44.     Morales testified that she and Martinez were seeing each other on February 2, 1987. That day, she was inside her first-floor apartment at 426 W. York Street when she heard shots around 10:45 a.m. *Id.* at 7-8.

45.     She opened the door to look out and saw a man running up the stairs after Martinez. She testified that she never saw his face and instead "just got a back look." *Id.* at 8-9.

46.     Morales stated several times that she never got a good look at the perpetrator. *Id.* at 8-10.

47.     Morales was asked if she identified David Turner to police, and she said she did, "but, like I say, I wasn't that sure. I only took a back look of the guy." *Id.* at 10.

48.     Without a judicial finding that Morales was now unavailable for cross-examination, her police statements were read into the record as substantive evidence. *See id.* at 13.

49.     ADA Buba asked Morales if she remembered telling Detective Piree that someone named "Daul" shot Martinez. Morales replied: "I was too high when I went over—I was too high. I just got finished freebasing. I don't remember that statement." *Id.* at 14.

50.     Morales also testified that she was high when she gave her police statements and that, "I couldn't remember, after, what happened to me, I seen it—I was like—it wasn't me. I didn't have my head on my shoulder. I feel like my head was in another world." *Id.* at 28-29.

51.     She testified that when she returned from her police interview on February 2, there was a man waiting in her room who said that he would "shoot her too" if she talked. *Id.* at 26.

52.     On cross-examination, Morales admitted that she wrote "fuck you" on the subpoena she was given for the original preliminary hearing on February 11. *Id.* at 25.

53.     Morales further admitted that she was afraid that the police might blame the shooting on her. *Id.* at 28.

54.     She testified that she did not want to be interviewed at the police station and that she wanted to get out of that situation as quickly as possible. *Id.* at 33. When asked if she knew that to leave the police station, she had to tell the detectives who did it, she responded, "No, I didn't. I didn't knew that until they told me." *Id.* She then refused to answer more questions until speaking to her lawyer. *Id.* at 34. After a consultation with Rodriguez, cross-examination resumed.

55.     At the conclusion of Morales' testimony, her attorney inquired about the status of her pending charges. *Id.* at 38-39. ADA Buba responded that she wanted to handle that after the preliminary hearing. When Newman requested to know the status of Morales' charges ADA Buba responded, "I haven't quite decided." *Id.*

56.     Detective Piree was questioned about the statement he took from Morales on February 2, 1987. *Id.* 39-40.

57.     He stated that Morales did not appear to be under the influence and that "she cried sometimes, not hysterically, but she cried sometimes because of the shooting of her common law husband." *Id.* at 40.

58.     He also explained that Morales had pointed Turner out to officers during her ride-along on February 2 as the person who shot Martinez, resulting in Turner's arrest. *Id.* at 41-42.

13

59.     Detective Piree was cross-examined about the circumstances of Morales' first police interview. He stated that questioning began at around 2:30 p.m. and that he immediately began typing questions and answers. *Id.* at 43-44.

60.     Detective Piree testified that after Morales' statement was taken, officers entered the room to comfort her.

> [S]he was alone in the room by herself, she had acknowledged the statement and signed it, she was sitting there alone and she was very depressed when she found out how serious her boyfriend was injured or deceased. And she was thinking about suicide. At that time, I believe, another detective talked to her for a while and I talked to her for a while. We were trying to console her.

*Id.* at 46.

61.     At the conclusion of the hearing, Judge Presenza set bail for Turner at $250,000.

*Id.* at 60.

62.     Despite having not "quite decided" following Morales' testimony what the disposition of her case would be, ADA Buba immediately *nolle prossed* absconding witness charges against Morales at the conclusion of the preliminary hearing. N.T. 4/6/88, 9.

## IV.     TRIAL

63.     Turner's trial began on April 4, 1988. Andrea Foulkes prosecuted the case for the Commonwealth. George Newman again represented Turner. Judge John Poserina, Jr. presided. On April 8, 1988, the jury convicted Turner of second-degree murder and possessing instruments of crime. Turner was sentenced to life without parole. *See* Docket Sheet, *Commonwealth v. Turner*, CP-51-CR-0304121-1987 (attached as Exhibit 23).

64.     The defense filed an omnibus pre-trial motion to suppress Turner's statement to police and Morales' identification of Turner. *See* Omnibus Pre-Trial Motion (attached as Exhibit 24). The Court held argument on the motion on March 29. That day, the Commonwealth announced that it might seek the death penalty. N.T. 3/29/88, 7-8.

14

65.     The Commonwealth called Detective Piree who testified regarding Morales'
interview and identification of Turner. *See generally id.* at 26-65. Detective Bova testified to
preparing the application for Turner's arrest warrant. *Id.* at 68-93.

66.     On the morning of jury *voir dire*, March 30, 1988, defense counsel announced
that he was withdrawing the motion "and in exchange the District Attorney has agreed not to
pursue the issue of death qualification." N.T. 3/30/88, 2.[7]

67.     The case against Turner hinged solely on Morales' testimony. No other evidence
implicated him at trial.

68.     The Commonwealth attempted to explain Morales' inconsistent statements and
failure to consistently cooperate by arguing that she was acting out of fear after being threatened
by Turner during the shooting and then threatened by an unknown black male hours later. The
defense, in turn, argued that Morales was not credible and was acting out of self-interest,
implicating Turner to avoid being suspected of murdering Martinez and cooperating in the hopes
that it would resolve her many outstanding criminal cases.

A.     **COMMONWEALTH WITNESSES**

69.     The Commonwealth called only one civilian witness, Rosemary Morales, and
otherwise used a bevy of law enforcement officials to bolster Morales' testimony.

---

[7]     Turner only recently became aware that ADA Foulkes sought permission from her
superiors to seek the death penalty but was denied permission to do so. *See* 3/29/88
Memorandum from ADA Foulkes (attached as Exhibit 25) (DT (DAO) 235-36); *see also* 3/30/88
Note from ADA Harley (attached as Exhibit 26) (DT (DAO) 000241). Unbeknownst to Turner
and his attorney, pursuing the death penalty had *not* been authorized and was ultimately denied at
the time the defense withdrew the suppression motion.

### 1. Rosemary Morales' Testimony

70. Morales testified differently at trial than she had at the preliminary hearing.

71. This time, Morales stated that on February 2, she asked Martinez to go to the store and get her orange juice, and he returned saying that they did not have juice at the store. N.T. 4/4/88, 68-69.

72. Then, "Dawul" knocked on their door and asked Martinez if he would "give him a break of $18.50 for a bag of heroin." *Id.* at 69.

73. Morales identified Turner as "Dawul." *Id.* When asked how long she knew Turner she said, "well, not long enough? ... I seen him a couple of times." *Id.* at 71.

74. Morales then recited her account of the shooting, which was largely consistent with her *second* statement to Detective Piree:

> He asked him to give him a break of $18.50 when the bag was $20. He say—Cheeno told him he couldn't. So he left out. When he came back in he fired. Cheeno tried to get away. But when he got upstairs—I can't talk [...] when the first shot came, he tried to get away. He run upstairs to the second floor. But he couldn't get away because the window upstairs was locked. So I just heard something fell down the steps, okay, by the time I heard the steps and come back, somebody ran down. I didn't know if it was Nelson or Dawul. But when I went up to them, he was laying right there. I know he wasn't dead, but I was so scared to go up and call the cops. By the time somebody in the building called the cops, by the time they got there, he was dead.

*Id.* at 70.

75. Morales was then asked if she saw Dawul again, and she said, "Yes. He said if I would have testified it would have been my life or my family's." *Id.*

76. Morales testified that when the shots were fired, she was inside her apartment "trying to hide." *Id.*

16

77.     Morales recognized Turner by his voice because she did not see his face. *Id.* at 71. "Well, I ain't seen no face, but I could remember voices. I don't got to see the face to remember your voice." *Id.* at 99.

78.     She then stated that she saw Turner through a cigarette burn mark made in a curtain that covered her front door, through which she looked into the hallway. *Id.* at 72.

79.     Following the gunshots, she said she heard someone running down the stairs. She "peeked out the door" and saw someone "in the lot [...] one house away from the house where we was at." *Id.* at 74. From the lot, apparently outside the building, the person who she identified as Turner said, "if I speak he will shoot me too." *Id.* at 71. That person was wearing jeans, brown or beige boots, and an army jacket. *Id.* at 75.

80.     After hearing gunshots and being threatened, Morales "just didn't pay that no mind and went upstairs, because I didn't heard Cheeno no nothing, so I thought he probably just got hurt and he was still living. But when I got there he was dead." *Id.* at 76.

81.     Morales testified that the folding knife was laying on his chest when she got to the body. Martinez had asked her to lend him the knife earlier that morning before the shooting. *Id.* at 77.

82.     She also testified that Martinez had drugs on him before the shooting, and afterwards she searched his body, but they were gone. *Id.*

83.     Morales further testified to her interactions with police. She did not recall speaking with Officer Woodruff. *Id.* at 80. She remembered being driven to 8th and Race to give a statement. *Id.* at 81. She stated that after her police interview, she got in the car with detectives and "drove around to see if we see him." *Id.* She stated that they drove to American and Susquehanna Streets and waited five to ten minutes. They continued driving, and "as we was

riding up the street, he was coming out. So I pointed to him, and the cops told me to get down in the car and to cover me with some newspapers. That's when they locked him up and took me back to 8th and Race." *Id.* Morales was not asked about, and did not testify to, first identifying Bobby or the subsequent police chase.

84.     After Turner's arrest, Morales gave a second statement at Homicide and then was driven home by detectives. She testified that she walked into her apartment around 1:30 a.m. *Id.* at 82. When she entered her apartment, there was a man there who "told me if I try to testify or something I will go with Cheeno to hell." *Id.* at 83.

85.     Morales testified that she left her apartment and went to her stepfather's house and slept there and then tried to "hide." "[…] I just tried to hide. And then the Homicide wagon they arrested me again." *Id.* at 84.

86.     Morales was asked why she had to be arrested to come to court. She stated that it was because she was scared. *Id.* at 85.

87.     Morales had picked up new charges since the preliminary hearing and disclosed that she had to be brought to court by the police. *Id.* at 88.

88.     Finally, when asked why she was testifying she said, "mainly because I want to get my case cleared, and I sure do not want to see a murder[er] to walk the streets for somebody who was a true friend to me." *Id.* at 89.

89.     On cross-examination, Morales was asked about her various aliases. *Id.* at 89-91. She stated that she was on probation and had new charges. *Id.* at 91.

90.     When questioned about ducking her subpoena for this case and absconding, Morales denied that the police had to search for her but admitted to writing "fuck you" on the subpoena when she was originally served. *Id.* at 93-97.

18

91.    Morales admitted to lying under oath at the preliminary hearing. *Id.* at 97. She denied that she was charged as an absconding witness. *Id.* at 94-95. She also denied being granted immunity in exchange for her testimony before eventually stating that she did not remember being granted immunity. *Id.* at 115-17.

92.    Morales was questioned about her drug use. She stated that she was a habitual cocaine user and bought and sold cocaine. *Id.* at 103. At the time of the crime, she was freebasing. *Id.* at 101. However, Morales stated that cocaine did not impair her memory and only made her more alert. She stated that she lied when she said she could not remember giving her police statement because she was high. *Id.* at 111.

93.    Morales was pressed on whether she implicated Turner to get out of trouble. She admitted that Detective Piree started asking her if she and Martinez had any arguments and that he asked if she shot Martinez. *Id.* at 104, 108.

94.    Eventually during her testimony Morales became uncooperative, stating: "I'm not going to answer shit to you." *Id.* at 112.

95.    On re-direct, Morales testified that she was across the street when Turner and Martinez argued the Friday before Martinez was shot. *Id.* at 118. During the argument, Turner held the fake shotgun recovered from 2051 N. Orianna. *Id.* at 124-25.

96.    She also stated that Turner was wearing "Bobby's" army jacket during the shooting and that the jacket had the name "Bobby" on it. *Id.*

97.    Morales was asked again about the circumstances of her testimony at the preliminary hearing. She stated that she was under arrest when she came to court. ADA Foulkes then asked "Now, after that was all over did anything bad happen to you?" Morales responded

19

"no" and then was asked "did anything especially good happen to you?" Morales again responded "no." *Id.* at 127.

98.     On re-cross Morales again became uncooperative. *Id.* at 130-31.

### 2.    Testimony of Responding Officers and Medical Examiner

99.     Officers William Sellers and Kenneth Brown testified that they were the first to arrive on scene on February 2, 1987. They encountered an "unknown Hispanic male" who stated that there was a shooting in the house. They went to the second floor and found Martinez lying on the second-floor landing on his back, with his feet up the stairs, with a folding knife on his chest, and a Hispanic female crying over him. N.T. 4/4/88, 34-39; *see also id.* at 55, 57, 59-60.

100.    Martinez did not have a heartbeat when Officer Sellers arrived. *Id.* at 35.

101.    Officer Sellers observed blood in the third-floor hallway. *Id.* at 37-38.

102.    Morales, who was identified as the Hispanic female but was using a different name, gave them a description that they sent out over the radio: "Negro male, wearing a gray cap, green army jacket, jeans, and a pair of tan work boots." *Id.* at 44. Morales also said the person was wearing silver-rimmed glasses. She did not say the name "Dawul" or David Turner. *Id.*

103.    Officer Brown also testified that when he initially asked Morales what happened, she said that she did not know and that she had just heard shots. Then she said that she was standing with Martinez and a man came and fired shots, they ran, and she could only see him from the side. *Id.* at 55.

104.    Officer Donald Woodruff testified that he had arrested Morales numerous times in the neighborhood, as recently as the Friday before trial. *Id.* at 65. He also testified that Morales told him that she knew who shot Martinez, and she knew where he lived. *Id.* at 63.

105.    On cross-examination, Officer Woodruff was impeached with his statement to Detective Hoffner in which he said, "she came out with me and I asked her who did it, and she stated that she would know the male by his face if she saw him." *Id.* at 63. He admitted that she did not tell him she knew where the perpetrator lived and that he had heard that from detectives discussing the case. *Id.* at 66.

106.    Multiple officers testified that there was no lighting in the second-floor hallway and that they needed flashlights to see because the hallways in the building were so dimly lit. *See id.* at 47; N.T. 4/5/88, 147.

107.    Dr. Halbert Fillinger read from the report of Dr. Catherman who performed the autopsy on Martinez. During his testimony, the parties stipulated that the cause of death was a gunshot wound and the manner of death was homicide. N.T. 4/5/88 at 87. Dr. Fillinger stated that Dr. Catherman found that the bullet struck Martinez in the front of his chest and travelled backwards "from above, downward, from front to back, and slightly to the right." *Id.* at 91. On cross-examination, Newman asked "[…] in order for it to have gone downward, the person firing would have had to have been a little bit above Mr. Rivera or Mr. Rivera would have had to have been leaning forward and facing the individual?" Dr. Fillinger responded "those are two of the possibilities that could exist." *Id.* at 99.

### 3.    Testimony About Physical Evidence

108.    A .38 caliber jacket projectile was removed from Martinez's body. *Id.* The wound on Martinez showed no evidence of powder residue, so it was not possible to determine the range of the gunshot wound. *Id.* at 93. Martinez also had cocaine, morphine, and heroin in his system at autopsy. *Id.* at 96.

109.    The Mobile Crime Detection Unit identified two projectiles at 426 W. York Street—one in the kitchen door in the rear of the first floor, which had traveled through the

21

staircase and lodged in the door, and another in the wall of the bathroom just above the bathtub on the second floor. *Id.* at 137.

110.    Officer Brenda Butler guessed that, based on the trajectory of the bullets, the shooter fired up the stairwell while standing on the first floor, then advanced up the stairway towards the second floor to fire the second shot. *Id.* at 142.

111.    The Firearms Identification Unit (FIU) could not compare the projectiles removed from the crime scene with the jacket found in Martinez. The FIU was only able to hypothesize that the projectiles were likely the same caliber and were sufficiently "consistent, from the lands and groove markings, to have come from a similar firearm." *Id.* at 106-08.

112.    Two search warrants were issued. One was for the boots Turner was wearing when he was arrested, based upon the affirmation of Detective Richard Bova that the boots had blood on them,[8] and the second was for firearms and other evidence potentially located at 2051 N. Orianna. *Id.* at 27-29.

113.    Turner's boots were seized when he was arrested. They were analyzed for the presence of blood, and none was detected. *Id.* at 127.

114.    Two "firearms" were recovered from 2051 N. Orianna Street. One was an inoperable BB gun, and the other was an item made of wood and rod and wrapped with black tape, made to look like a firearm. Both "weapons" were incapable of propelling a projectile, and thus were incapable of firing a .38 caliber bullet. *Id.* at 109-11, 113.

---

[8]     Detective Bova testified that he made this representation based on a stain that he observed on the boots. However, his sworn statement in the warrant is far more specific: "On 2/2/87, the deft., [T]urner was arrested and was wearing a pair of tan boots with blood on the boots. It is requested that a night time warrant be issued so that law enforcement authorities can take the boots from the deft to compare, if possible, the blood on the deft's boots to the blood of the deceased." Search Warrant (DT (HF) 000214-16).

115.    A pair of leather gloves was found in the hallway; one glove was at the bottom of the third-floor steps on the landing, and the second was in the second-floor hallway. *Id.* at 138; *see also* N.T. 4/5/88, 8.

116.    Officer Butler testified that she did not dust for fingerprints because the gloves had been used in the commission of the crime. N.T. 4/5/88, 145.

117.    No blood was detected on the two items left at the crime scene—a folding knife placed on Martinez's chest and the leather gloves. *Id.* at 121, 125.

118.    The leather gloves contained trace amounts of lead residue, which could be indicative of firearm use. *Id.* at 122, 124.

119.    No other physical evidence was found, and the .38 caliber firearm used to shoot Martinez was never recovered.

### 4.    Testimony About David Turner's Arrest

120.    To find Turner, Morales rode in the back of an unmarked police car and directed Detectives Bova and Campbell towards 2051 N. Orianna, which is where she said the perpetrator lived. *Id.* at 12-13. Morales was slouched down so as not to be noticed but could still see out the window: "Her head was—or her eyes were above the door area of the dashboard area of the vehicle, so that she could view from the side windows and also the front window of our vehicle." *Id.* at 12.

121.    As they were driving, Morales pointed out "Bobby." Bobby was standing on the corner, wearing a green army jacket, just as she had described the perpetrator. *Id.* at 14. Detective Piree left the vehicle and approached him, but Bobby fled, running through a vacant lot, into a back alleyway off Diamond Street, and into the rear of a house on that block. *Id.* at 14-15, 51-52. Detective Campbell left the car and joined Detective Piree in pursuit of Bobby. *Id.* at 14-15.

23

122.    After returning to the car, Detective Campbell drove around the block to the twenty-hundred block of North Orianna Street. There, Morales pointed out Turner, and Detective Campbell placed him under arrest. *Id.* Turner was standing on the street along with many other individuals and was speaking to a uniformed police officer when Morales identified him. *Id.* at 44.

123.    The defense admitted Turner's arrest photo as Exhibit D-1. The photo showed that Turner had facial hair at the time of his arrest. *Id.* at 21. When he was arrested, Turner said his nickname was Dawud. He was wearing a black cap, dark blue down jacket, a red shirt, black corduroy pants, and brown boots. *Id.* at 63-64. He was not wearing a green army jacket, jeans, a red and blue flannel shirt, a gray cap, or glasses, the clothing that Morales had described the perpetrator as wearing.

124.    After his arrest, Turner waived his *Miranda* rights and gave a statement to the police. N.T. 4/5/88, 132-37.

125.    Through Detective Hoffner, the Commonwealth read Turner's statement into the record. *Id.* at 138-42.

126.    Detective Hoffner stated that after giving his statement, he informed Turner that Morales had identified him, and Turner "got nervous and he slumped down in the chair. He wouldn't look at me after that point." *Id.* at 143.

127.    Detective Hoffner also drove Morales home after her second interview around 1:30 a.m. on February 3. He said he waited until she got in the house and then drove away. *Id.* at 146.

128.    Defense counsel crossed Detective Hoffner about whether Turner appeared like someone who had ingested twelve bags of heroin before his police interview, which is the

24

amount allegedly stolen from Martinez's body. Detective Hoffner stated "he appeared normal." *Id.* at 149-50.

129.    Detective Piree also testified about his custodial interview of Morales. He stated that he had an unrecorded conversation with her first, in a homicide interrogation room, and then began typing recorded questions and answer responses. *Id.* at 55.

130.    Detective Piree did not observe her to be under the influence of any substances but stated that she was "nervous, upset. She cried a few times. She was a little bit frightened. She was coherent, sober, aware of where she was, what we were talking about. She had full control of her faculties." *Id.* at 56.

131.    He stated that when he was not typing her answers, Morales' story was different from when he was typing them. *Id.* at 59. While he was not typing, she said that she was standing in the hallway when a man pursued Martinez up the stairs, pulled a gun out, chasing and firing shots. The man then ran back down the stairway, passed her, and put a gun in her face and threatened her. *Id.*

132.    When Detective Piree began typing, Morales "changed it to where she was back in her apartment at the time of the pursuit and she was not able to see that much." *Id.*

133.    He said he "approached her verbally and said 'I want you to tell me the truth now.'" *Id.*

134.    According to Detective Piree, Morales was never a suspect, and he never suggested that to her. *Id.* at 60.

135.    The Commonwealth asked whether Morales was "concerned about anything, in regards to this matter?" Detective Piree responded that she was "fearful of the defendant and she seemed very much remorsed [sic] of the deceased." *Id.* at 62.

25

136.    On cross-examination, Detective Piree was questioned about the differences between Morales' first, unrecorded statement and what he typed. *Id.* at 65-66. For example, Morales initially described the perpetrator to him as a black man with curly hair that is gray on the side, and she did not mention the name Dawud. *Id.* at 67.

137.    Throughout his testimony, Detective Piree described Morales' demeanor as "remorseful" several times. *Id.* at 69, 70.

138.    The Commonwealth's final witness was ADA Buba, who had represented the Commonwealth at Turner's preliminary hearing. N.T. 4/6/88, 5.

139.    ADA Buba largely testified about an unrecorded conversation that occurred between herself, Morales, Morales' attorney Reuban Rodriguez, an Officer Deyne, and a Detective Ballentine in the courtroom before the preliminary hearing on September 26, 1987. *Id.* at 6.

140.    Morales was under arrest at this time, had been charged with absconding, and had been detained on other bench warrants. *Id.* at 6-7. Although unknown at the time of trial, she was also under suicide watch. *See* Section VI, below.

141.    During this conversation, ADA Buba discussed the substance of Morales' testimony with her. She stated that she went over the statement Morales gave to Detective Piree and asked her "what was the truth. Was it true that she could identify the defendant as the person who was involved in this shooting, or did she not see it." N.T. 4/6/88, 14.

142.    According to ADA Buba, Morales "had indicated to me in the back that the defendant as the person that had done the shooting." *Id.*

143.    ADA Buba recited what she said Morales told her in the courtroom, and it was nearly identical to what was in the second half of Detective Piree's statement. *Id.* at 15-17.

26

144.    The Commonwealth read Morales' preliminary hearing testimony to the jury through ADA Buba. *Id.* 19-48.

145.    ADA Buba attempted to explain why she offered Morales immunity. Morales apparently told ADA Buba that she planned to plead the Fifth. To ensure that Morales would testify, ADA Buba spoke to Morales' attorney and told him that she would give Morales immunity "as to her testimony in the homicide trial so that it wouldn't affect her absconding witness charge." *Id.* at 10. ADA Buba stated that she thought Morales' testimony would hurt Morales in her absconding witness case.

146.    The immunity agreement was not limited to the absconding case, but instead provided immunity for anything other than perjury arising from Morales' testimony. *Id.* at 67.

147.    ADA Buba withdrew the absconding witness charge immediately after the preliminary hearing. *Id.* at 49-50.

148.    On cross-examination, ADA Buba was asked whether she reported her conversation with Morales to the police to memorialize a statement, and she said no. *Id.* at 52.

149.    ADA Buba was crossed about a handwritten memo she prepared after the preliminary hearing regarding her conversation with Morales. That memo only contains one statement from Morales, and not the lengthy statement ADA Buba recited to the jury. *Id.* at 54-55; *see also* Memo from ADA Buba (DT (DAO) 000278-79) (attached as Exhibit 27).

150.    ADA Buba was asked whether she had any personal knowledge that led her to believe that Morales was telling the truth. She testified "that's just based on my personal opinion and beliefs." N.T. 4/6/88, 73.

151.    After ADA Buba's testimony, the defense moved for a mistrial on the basis of improper vouching by ADA Buba, as well as on the grounds of comments made by ADA

27

Foulkes about Newman while ADA Buba was on the stand, in front of the jury.[9] Both requests were denied. *Id.* at 78.

152.   The defense also moved for a *demurrer* at the close of the Commonwealth's case citing the unreliability of Morales. This was also denied. *Id.* at 79.

**B.   DEFENSE WITNESSES**

153.   The defense called one witness. Officer Christina Goodwin testified that Morales told Goodwin that she had never seen the shooter before and merely described him as a "black male with light skin." *Id.* at 81.

154.   On cross, Officer Goodwin testified that Morales was "terribly hysterical and sobbing" when she arrived. *Id.* at 82.

155.   The parties then stipulated that that if Officer McKenna was to testify, he would say that he responded at 12:50 pm, he was one of the first officers on scene and that Morales gave him a description of the man she saw leaving: "She told us that it was a black male wearing a green army jacket, dungarees, green knit hat and silver or gold-rimmed glasses. I asked her if she knew who he was, and she said she never saw him before in her life." N.T. 4/6/88, 85.

**C.   CLOSINGS**

156.   The parties' closing arguments each centered around Morales. Each offered explanations for Morales' recantations.

157.   The defense argued that Morales implicated Turner because Detective Piree started focusing his questioning on her and that she cooperated with the prosecution because she

---

[9]      During her re-direct of ADA Buba, ADA Foulkes implied that Newman inappropriately suggested that there was a "secret deal" between Morales and the Commonwealth, which Newman objected to. N.T. 4/6/88, 70. ADA Foulkes also characterized Newman's cross-examination of ADA Buba regarding the contents of her memo as his "complaining" that he "couldn't effectively cross-examine because there is not a longer memorandum." *Id.* at 57.

28

wanted to get out of custody and resolve her other cases. *Id.* at 96. Defense counsel highlighted her lack of credibility and the fact that she was an admitted liar. *Id.* at 99.

158.    The defense pointed out the inconsistencies between Morales' initial description of the perpetrator and Turner's appearance at arrest. *Id.* at 103. Counsel also argued that the Medical Examiner's findings regarding the trajectory of the bullet that killed Martinez were not consistent with Morales' account of the shooting. *Id.* at 100.

159.    Summing up the Commonwealth's evidence, defense counsel said "it really comes down to Rosa. Can you accept the word of that woman in order to convict him of murder and possession of an instrument of crime?" *Id.* at 114.

160.    The Commonwealth also attempted to explain why Morales was inconsistent, arguing that Morales had conflicting motivations. According to the prosecution, Morales wanted to cooperate to vindicate her partner but also did not want to cooperate to protect herself from the threats she had received. *Id.* at 127-28. However, the Commonwealth also argued that, "she was a witness, again, who had very insignificant ties to law enforcement or interest in the community well-being, and she had every interest to fear him." *Id.* at 147-48.

161.    The Commonwealth generally tried to paint Morales as a product of her environment using this inflammatory analogy to gloss the Commonwealth's case while likening Turner to the devil:

> Now, ladies and gentleman, if a crime such as murder is committed in a monastery there are holy men who would come forward to testify as to what happened with regards to that crime. But when, an expression I think may be well-known to you, when a crime is committed in such a circumstance as this, when you must prosecute the devil, you often have to go to hell for your witnesses. Now, I suggest to you, ladies and gentlemen, that the world that Rosa Morales lives in is about as close to hell as we know on earth. And she must be regarded in light of the world that she comes from.

*Id.* at 123.

29

162.    The Commonwealth also characterized Morales as "a very brave young woman."
*Id.* at 134.

163.    At the conclusion of the Commonwealth's closing, the defense moved for a
mistrial on eleven grounds related to the Commonwealth's closing argument, including that
ADA Foulkes likened Turner to the devil, while she characterized Morales as "a very brave
woman"; argued for sympathy for Morales by twice referencing that she was pregnant with
Martinez's child when he died, although this fact was not in evidence; commented on Turner's
post-*Miranda* silence; placed an unconstitutional burden on the defense by telling the jury the
defense was raising inconsistent defenses and therefore did not want to get to the truth; and the
totality of the Commonwealth's argument. *Id.* at 160-75. The Court denied the motion. *Id.*

164.    The following morning, the defense renewed its mistrial motion based on ADA
Buba's testimony, now citing a pending Pennsylvania Superior Court Case and the Pennsylvania
Rules of Professional Conduct. The Court again denied the motion. N.T. 4/7/88, 1-18.

### D.    DELIBERATIONS

165.    Jury deliberations began around noon on April 7, 1988. A few hours into
deliberations the jury asked to see four documents: a transcript of ADA Buba's testimony;
Turner's police statement; Morales' testimony; and Morales' first statement to Detective Piree.
*Id.* at 53-54. The Court sent back a note asking for clarification regarding the jury's
disagreement, and it sent another note asking for Morales' police statement, Turner's police
statement, and the notes of Morales' testimony. *Id.* at 56.

166.    Next, the jury asked for Morales' testimony to be read back. *Id.* at 55.

167.    The Court brought the jury back to discuss its questions. The judge admonished
the jurors that they needed to rely on their independent recollections of Morales, noting that she
was "the key witness in the case." *Id.*

30

168.    Citing the Rules of Criminal Procedure, the judge declined to provide the jury with Morales' testimony. *Id.* at 57.

169.    The jury sent a final note on the afternoon of April 7, 1988: "Your Honor, we seem to be hopelessly deadlocked. People are not going to change their minds." *Id.* at 58.

170.    The defense again moved for a mistrial or, in the alternative, for the jury to be re-instructed. The Court denied both requests. *See* 4/26/88 Post-Verdict Motions (attached as Exhibit 28) at 2-3.[10]

171.    Over the defense's objection, the Court sequestered jurors for the night and sent them to their hotel.

172.    According to defense counsel, after the deadlock, the Court persuaded the Commonwealth to offer Turner a plea deal. The Commonwealth offered him a deal of 5-10 years with credit for time served. Turner declined that offer. *See* George Newman Certification (attached as Exhibit 29).

173.    Deliberations began again at 9:30 a.m. the following morning, and the jury returned a verdict of guilty on second-degree murder and possessing instruments of crime at 11:43 a.m. *See* N.T. 11/30/88, 6.

174.    On April 8, 1988, the Court, sentenced Turner to life on the count of second-degree murder and suspended a sentence for possession of an instrument of crime. *Id.* at 2.

## V.    PROCEDURAL HISTORY AND PRIOR COUNSEL

---

[10]    The prosecutor submitted an affidavit following the trial stating that she had no memory of Newman requesting that the jury to be re-instructed. N.T. 11/30/88, 10. For reasons that are unknown, the Court closed the record on April 7, so the proceedings on April 8 were not transcribed.

175.    The defense filed post-verdict motions including a motion in arrest of judgment and for a new trial on April 26, 1988. Judge Poserina held a hearing on those motions on November 30, 1988, and denied them at the end of the hearing.

176.    George Newman continued to represent Turner for his direct appeal, which was filed on April 28, 1989. Turner appealed on six grounds: (1) sufficiency of the evidence; (2) the sufficiency of the Court's jury instructions following deadlock; (3) error of the trial court for improperly ruling that a juvenile conviction could be admitted against Turner for purposes of cross-examination; (4) error of the trial court for allowing the testimony of ADA Buba; (5) prosecutorial misconduct for statements made by ADA Foulkes during closing argument; and (6) violation of Turner's speedy trial rights.

177.    The Superior Court affirmed on December 14, 1989. Turner filed a request for reargument or reconsideration on December 22, 1989 that the Superior Court denied on January 26, 1990.

178.    Turner filed a petition for allowance of appeal to the Pennsylvania Supreme Court on February 22, 1990. The Supreme Court denied the petition on September 19, 1990.

179.    On December 14, 1989, Turner filed a *pro se* writ of mandamus in the Pennsylvania Supreme Court.

180.    On October 30, 1990, Turner filed a *pro se* petition for writ of habeas corpus in federal court under 28 U.S.C. § 2254. On April 8, 1992, Magistrate Judge William F. Hall issued a Report and Recommendation ("R&R") recommending that Turner's petition be denied. Turner appealed to the Third Circuit, which dismissed for lack of jurisdiction on May 20, 1992. On March 8, 1993, District Court Judge Lowell A. Reed issued an order adopting the R&R and denying Turner's first habeas petition.

32

181.    On July 12, 1996, Turner filed his first PCRA petition, *pro se.* Turner raised

several ineffective assistance of counsel claims and due process claims regarding ADA Buba's

testimony at trial. Attorney Lee Mandell was appointed to represent him but filed a *Finley* letter

on October 7, 1997. As a result, Judge Poserina dismissed the petition without a hearing on

November 7, 1997.

182.    Turner appealed to the Pennsylvania Superior Court, *pro se.* The Superior Court

vacated the judgment and remanded for further proceedings on June 29, 1999. Appointed

counsel, David Rudenstein, filed an amended PCRA petition, and the Court held an evidentiary

hearing on July 25, 2001. The Court dismissed Turner's amended PCRA petition on September

19, 2001. The Superior Court affirmed on September 16, 2002, and the Pennsylvania Supreme

Court denied Turner's petition for allowance of appeal on January 28, 2003.

183.    On May 8, 2003, Turner filed a successive petition for a writ of habeas corpus in

the Eastern District of Pennsylvania. On December 23, 2003, Magistrate Judge James R.

Melinson recommended that Turner's petition be dismissed. Turner filed an amended petition

and application for reconsideration on February 2, 2004. The District Court denied those

applications on February 3, 2004, and denied a certificate of appealability on September 1, 2004.

Turner appealed to the Third Circuit. The Third Circuit denied the appeal on November 3, 2004.

On March 4, 2005, Turner filed a petition for a writ of certiorari with the United States Supreme

Court, which was denied.

184.    On May 12, 2005, Turner filed a *pro se* "Motion for *Nunc-Pro-Tunc*" with the

Pennsylvania Superior Court, alleging that the court was required to review the six remaining

claims from his 1996 PCRA petition. The court denied this motion on June 8, 2005.

185.    On May 4, 2006, Turner filed a *pro se* motion in the Court of Common Pleas challenging the legality of his sentence, which the Court treated as a second PCRA petition. On December 22, 2006, Judge Posersina dismissed the petition as untimely. Turner filed a notice of appeal on February 8, 2007. The Superior Court affirmed on August 15, 2007.

186.    Turner filed a third *pro se* PCRA petition on August 8, 2006. On February 6, 2007, Judge Poserina denied the petition as untimely. On April 1, 2008, the Superior Court affirmed. On August 26, 2008, the Pennsylvania Supreme Court denied Turner's petition for allowance of appeal.

187.    On March 12, 2009, Turner filed a third federal habeas petition in the Eastern District of Pennsylvania, which denied it on April 21, 2009. On November 20, 2009, Turner filed a letter motion to appeal to the Third Circuit, which denied the appeal on August 30, 2010. His request for a certificate of appealability was denied on August 3, 2010. He filed a petition for rehearing *en banc* on August 17, 2010, which was denied on September 1, 2010.

188.    On February 3, 2012, through counsel at the Pennsylvania Innocence Project, Turner filed a petition for post-conviction DNA testing seeking testing of the leather gloves found at the crime scene. The Commonwealth opposed Turner's petition. The Honorable Teresa Sarmina granted Turner's petition on June 20, 2013, but the results of the testing were inconclusive.

## VI.    NEW EVIDENCE UPON WHICH THIS PETITION IS BASED.

189.    Turner and his counsel knew at the time of Turner's trial about Morales' varying statements, her drug use, and the immunity granted Morales for her testimony. What Turner and his counsel did not know, and could not have known until the Commonwealth's recent disclosures, was that, when she was interacting with the police and the District Attorney's Office, Morales was suffering a mental health crisis, even to the extent of having suicidal

ideations. These circumstances, and the Commonwealth's conduct in response to Morales' condition, have been hidden until now, and are the foundation of this petition.

190.    At Turner's preliminary hearing, the Commonwealth disclosed that Morales had been charged as an absconding witness for hiding from the police and stating that she intended to run away to New Jersey to avoid testifying. However, the full details of Morales' flight, and the police's interactions with her leading up to the preliminary hearing, were not known until the Commonwealth disclosed the Philadelphia Police Department's Homicide File (H-File) and the District Attorney's Office File ("DAO File") to Turner in May 2023.

191.    On February 5, 1987, not even two days after the police dropped Morales back at her apartment, they returned to find that she had suddenly moved out. *See* 2/2/87 PPD Activity Sheets (DT (HF) 000337) at 2. Rafeal Lopez, the building's owner, told Detectives Bova and Hoffner that Morales had moved out on Wednesday, February 4, and did not return to pick up her belongings. *Id.*

192.    After Detectives Bova and Hoffner left, Lopez located a note that Morales had left in the apartment. Police took Lopez to the Homicide Division where he turned over a suicide note that Morales wrote and addressed to her mother "Norma." *See* Morales' Suicide Note (attached as Exhibit 30) (DT (HF) 000295-99).

193.    The note reads: "Dear Mom, I'm writing to tell you, good [bye] I think is time for me, to kill myself. I just what you to do me a favor, and tell my kid the I didn't give them up for my freedom it was because I didn't have no where to go with them. I love them but I was to young didn't know what I was doing and I kill myself because if I couldn't give them no love I know I was not going to get none back. I allway's felt like my family didn't love me so I left

35

what I had to love I wish I known what was love. Please do for my kid's what I couldn't for them. Love all Goodbey. Died Rose." *Id.*

194.    The note concludes with an illustration of Morales hanging.



195.    Detectives Hoffner and Starr searched for Morales in several locations where she was known to stay or to engage in prostitution. *See* 2/12/87 PPD Activity Sheets (attached as Exhibit 31) (DT (HF) 000356-58).

196.    Detectives then went to Morales' mother's house and spoke to Norma Torres. Torres told the detectives that she had not heard from or seen Morales since before the shooting and that she did not know where she was. *Id.* at 2.

197.    As stated above, Morales did not appear at Turner's preliminary hearing on February 11, 1987.

198.    That night, Torres called the police and said that she knew where Morales was staying. At 5:30 a.m. on February 12, the police went to 2910 N. Leithgow Street and found Morales sleeping on the couch. *Id.* at 3.

36

199.    Police arrested Morales and brought her to the Homicide Division where she was strip searched. While in custody she made comments that she planned to commit suicide. *See* 2/12/87 PPD Memorandum (attached as Exhibit 32) (DT (HF) 000241).

200.    Morales also stated that she did not want to testify and that if released she would go to New Jersey to avoid testifying. *See* 2/12/87 Investigation Interview of Record Rosemary Morales;[11] *see also* 2/12/87 PPD Activity Sheets (DT (HF) 000358) at 2. She also stated that when the police returned her to her apartment around 1:30 a.m. on February 2, there was a man waiting for her inside who threatened to kill her if she testified. 2/12/87 Investigation Interview of Record Rosemary Morales 2-3.[12]

201.    Police learned that Morales had two outstanding bench warrants under the name "Rosa Carmona." 2/12/87 PPD Activity Sheets (DT (HF) 000358) at 3.

202.    Morales also had a detainer from a probation violation. *See* Probation Department Detainer (attached as Exhibit 33) (DT (HF) 000360).

203.    Morales was then arraigned and served with an arrest warrant for default of required appearance, and absconding witness, both misdemeanors. *See* 2/12/87 Warrant for Arrest of Rosemary Morales (attached as Exhibit 34) (DT (HF) 000222-27).

204.    The Philadelphia Police Department did all it could to ensure that Morales was not released from custody. At her arraignment, the district attorney made a "High Bail Request" and a request for a psychiatric examination. The Court was apparently notified that Morales had recently and repeatedly stated that she was going to commit suicide. *See* 2/12/87 PPD Activity

---

[11]    This was disclosed before trial.

Sheets (DT (HF) 000359) at 3; *see also* 2/12/87 Municipal Court Hearing List (DT (HF) 000285)

(attached as Exhibit 35); Detainer (DT (HF) 000360).

205.    The police were aware that Morales had threatened suicide. On February 12,

Detective Hoffner wrote a memo, which was approved by the Captain of the Homicide Division,

stating "all personnel who process Rosemary Morales PP#638831 should be made aware of the

fact that while in police custody she made remarks that she was going to commit Suicide.

Request that this prisoner be treated accordingly." 2/12/87 PPD Memorandum (DT (HF)

000241).

206.    Morales was placed on suicide watch and detained in custody until she could

testify at Turner's preliminary hearing.

207.    Before trial the Commonwealth disclosed only that Morales had been charged as

an absconding witness and that she stated that she planned to flee to New Jersey to avoid

testifying because she had been threatened. N.T. 4/6/88, 6-7.

208.    On May 1, 2023, the Philadelphia District Attorney's Office disclosed the H-File

to Turner's counsel. The file contained exculpatory material that was previously undisclosed.

209.    Specifically, the H-File contained significant pieces of evidence discussed above

regarding Morales' mental state, credibility, and contacts with law enforcement, including

evidence regarding a potential suicide attempt and suicidal remarks Morales made to police,

necessitating her placement on suicide watch:

        a.    Rosemary Morales' four-page suicide note, obtained by the police from Rapheal

            Lopez after Morales left it in her apartment when she suddenly moved out on

            February 4, 1987. *See* Morales' Suicide Note.

b.   The February 12, 1987 Philadelphia Police Department Memorandum written by Detective Hoffner stating "all personnel who process Rosemary Morales PP#638831 should be made aware of the fact that while in police custody she made remarks that she was going to commit suicide." 2/12/87 PPD Memorandum (DT (HF) 000241).

c.   PPD Activity Sheets from February 5 and 12, 1987 detailing Morales' disappearance and police attempts to locate her. These activity sheets state that when Morales was arrested "she was abusive to the police and stated that when the police got done talking with her, she was going to Camden NJ and was not going to testify against David. She stated that she was going to commit suicide." *See* 2/2/87 PPD Activity Sheets at 13, 2/12/87 PPD Activity Sheets at 3. The Activity Sheets also state that Morales was transported to Homicide and was "strip searched by the police matron in the detention unit." *Id.* Morales was served with her outstanding detainers and bench warrants, and during her arraignment on February 12, the prosecutor requested high bail and a psychiatric examination. Finally, "a memo was attached to the defendant's paperwork indicating her recent remarks that she was going to commit suicide." *Id.* at 4.

d.   February 18, 1987 Municipal Court Hearing List with the notation "see attached suicide watch" Municipal Court Hearing List.

e.   Copies of Morales' probation detainer with "Suicide Watch" handwritten and circled. *See* Detainer.

210.   On May 8, 2023, the Commonwealth disclosed the DAO File to Turner's counsel. That file contained:

a. A copy of the February 12, 1987 PPD Memo from Detective Hoffner stating that Morales had made suicidal remarks while in custody and requesting that she be treated accordingly. *See* PPD Memo (DT (DAO) 000198) (attached as Exhibit 36).

b. A memorandum from ADA Andrea Foulkes to her supervisor ADA Ray Harley requesting permission to seek the death penalty against Turner, dated March 29, 1988. *See* 2/29/88 Memo From ADA Foulkes. That memo states:

> Given the outrageous circumstances of the killing, threats to the witness which succeeded in causing her to refuse to cooperate with the prosecution and the one aggravating circumstance of the defendant's prior record, I request approval to seek the death penalty in this case.

*Id.* at 2.

c. A return memo from ADA Harley sent a memo back to ADA Foulkes with a note stating, "denied after discussion with ADA Loy." Note from ADA Ray Harley.

211.   Turner's trial attorney George Newman made a discovery demand under the Pennsylvania Rules of Criminal Procedure for exactly the type of information contained in the H-File and DAO File:

> Any and all other records and/or information which arguably could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the Commonwealth's evidence or which arguably could lead to such records or information, including, but not limited to: any and all scientific, hospital, medical, psychiatric, psychological, social work, mental health, drug and/or alcohol, pre-sentence investigation or other reports which tend to reflect on the credibility or competence of any of the prospective witnesses for the Commonwealth.

*See* 3/24/87 Letter from Newman to Discovery Unit (attached as Exhibit 37) (DT (DAO) 000698-702) at 2.

212.   Despite this clear demand and its constitutional obligation to provide exculpatory and impeaching material even without a discovery request, the Commonwealth did not disclose

40

any of this material to Turner before 2023. The cover letter itemizing the documents provided before trial does not mention any of the documents detailed above. *See* 4/7/87 Discovery Letter (attached as Exhibit 38) (DT (DAO) 000697).

213. Newman also does not remember being provided with any of the above-detailed information. In particular, he was never informed that Morales was suffering from a mental health crisis. Had he known that fact, he would have used it at trial. *See generally* George Newman Certification.

## VII. JURISDICTION AND ELIGIBILITY FOR RELIEF

214. This Court has jurisdiction over this petition, and Turner is eligible for relief under the PCRA.

215. A PCRA petition shall be filed within one year of the date the judgment becomes final. *See* 42 Pa. C.S. § 9545(b).

216. Though Turner's conviction became final many years ago, the claims raised in this PCRA petition are timely under the governmental interference and new facts exceptions to the one-year limitation.

217. *First*, Turner's failure to raise the claims in this petition earlier "was the result of interference by government officials with the presentation of this claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States." 42 Pa. C.S. § 9545(b)(1)(i). Specifically, the Commonwealth suppressed the evidence in the H-File and DAO File on which Turner's claims are based in violation of the Pennsylvania and United States Constitutions

218. *Second*, Turner also presents new facts that he could not have known earlier with the exercise of due diligence. *See* 42 Pa. C.S. § 9545(b)(1)(ii). Whether a petitioner has exercised due diligence in attempting to obtain new evidence is a fact-specific analysis focused on whether

the petitioner made "reasonable efforts" to uncover the new facts on which his petition is based. In *Commonwealth v. Cox*, the Supreme Court emphasized that "[d]ue diligence 'does not require perfect vigilance and punctilious care, but merely a showing the party has put forth reasonable effort' to obtain the information upon which a claim is based." 146 A.3d 221, 230 (Pa. 2016) (quoting *Commonwealth v. Edmiston*, 65 A.3d 339, 348 (Pa. 2013)). Here, Turner investigated and litigated his case for decades and sought discovery before trial, including requesting precisely the types of documents regarding Morales' mental state that have now been produced decades later. Even with these efforts, he could not have found evidence that the Commonwealth was affirmatively hiding from him.

219.    *Third*, Turner is filing this PCRA petition within one year of the Commonwealth's production of the H-File on May 1, 2023, and DAO File on May 8, 2023, satisfying the requirements of 42 Pa. C.S. § 9545(b)(2).

220.    Turner is also eligible for relief under the PCRA because he alleges a *prima facie* case of miscarriage of justice as required by *Commonwealth v. Lawson*—namely that "the proceedings which resulted in his conviction were so unfair that a miscarriage of justice occurred which no civilized society could tolerate, or that he was innocent of the crimes charged." *Commonwealth v. Morales*, 701 A.2d 516, 620-21 (Pa. 1997).

221.    Turner is currently serving a life prison sentence in the State Correctional Institution at Dallas (Inmate #AS0830). 1000 Follies Road, Dallas, PA 18612. *See* 42 Pa. C.S. § 9543(a)(1)(i).

### CLAIMS FOR RELIEF

**CLAIM 1:     THE COMMONWEALTH VIOLATED TURNER'S STATE AND FEDERAL DUE PROCESS RIGHTS BY SUPPRESSING ROSEMARY MORALES' SEVERE MENTAL HEALTH CRISIS**

222.     The PCRA provides relief to a petitioner who proves by a preponderance of the evidence that his conviction and sentence resulted from "[a] violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa. C.S. § 9543(a)(2)(i).

223.     The federal and state constitutions each guarantee due process of law to criminal defendants. U.S. Const. Amends. V & XIV; Pa. Const. Art. 1 § 9.

224.     Due process requires the prosecution to disclose material evidence favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Commonwealth v. Weiss*, 986 A.2d 808, 814 (Pa. 2009).

225.     There are three elements to a *Brady* claim: (a) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (b) the government must have suppressed the evidence, whether intentionally or inadvertently; and (c) the suppressed evidence was material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see also Commonwealth v. Burke*, 781 A.2d 1136, 1141 (Pa. 2001).

226.     To establish materiality, a petitioner "need not show that he 'more likely than not' would have been acquitted if the new evidence was admitted." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (*per curiam*). Rather, evidence is material "when there is any *reasonable* likelihood it could have affected the judgment of the jury." *Id.* (emphasis added) (citations and internal quotation marks omitted); *see also, e.g., Dennis v. Sec'y, Pa. Dep't of Corrections*, 834 F.3d 263, 285 (3d Cir. 2016) (*en banc*) (the "touchstone of materiality is a reasonable probability"). "The adjective is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*; *see also Weiss*, 986 A.2d at 815. It follows that a petitioner can still prevail even if "the undisclosed information may not have affected the jury's verdict." *Wearry*, 577 U.S. at 392 n.6.

227.     The *Brady* materiality standard is co-extensive with *Strickland* prejudice. *See Marshall v. Hendricks*, 307 F.3d 36, 53 (3d Cir. 2002). *Strickland* prejudice is established, like *Brady* materiality, by a showing of less than a preponderance of the evidence. Because a reasonable probability is one "sufficient to undermine confidence in the outcome," *Strickland v. Washington*, 466 U.S. 668, 694 (1984), the *Strickland* prejudice standard is not "stringent"; it is, in fact, "less demanding than the preponderance standard," *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) ("[*Strickland*] specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered.").

228.     In assessing materiality, the Court does not examine the impact of each piece of suppressed evidence. Rather, the impact of the suppressed exculpatory evidence is viewed cumulatively. *Kyles*, 514 U.S. at 434 ("stressing" that materiality is considered "*collectively, not item by item*" (emphasis added)); *Dennis*, 834 F.3d at 360 (same).

229.     Here, the Commonwealth's suppression of material exculpatory and impeachment evidence in the H-File and DAO file violated Turner's federal and state due process rights in violation of *Brady* and its progeny.

230.     *First*, the evidence was both exculpatory and impeaching because it impeaches Morales' credibility and sheds light on her interactions with law enforcement in a new way. It directly contradicts the Commonwealth's theory that Morales was unreliable because she was

threatened, and instead provides the defense a new theory, which was unavailable at trial, that she was unreliable because she was suffering a serious and catastrophic mental health crisis at the time that she identified Turner.

231.    *Second*, this information was suppressed. The documents supporting this claim were contained in the H-File and DAO-File produced in May 2023. They were not disclosed before trial, despite trial counsel's specific request for such evidence. *See* 3/24/87 Letter from Newman to Discovery Unit at 2; *see* 4/7/87 Discover Letter; *see also* George Newman Certification.

232.    *Third*, there is no question that the undisclosed evidence regarding Morales' mental state is material.

233.    According to the trial court, Morales was "the key witness in the case." *Id.* at 55. Her credibility and her various communications and interactions with the police were the central issues at trial.

234.    During the time period that Morales identified Turner to police through varying accounts of the crime, she was suffering from a mental health crisis so severe that she wrote a suicide note to her mother, required being placed on suicide watch while in custody, and was ordered by the Municipal Court to have a psychiatric examination. Turner would have been able to use these facts to cross examine Morales. *See Wilson v. Beard*, 589 F.3d 651, 666 (3d. Cir. 2009) (suppressed evidence of a witnesses' mental health condition was material where it undermined their reliability); *Cohen v. Albert Einstein Med. Ctr.*, 592 A.2d 770, 726 (Pa. 1991) ("Evidence of mental illness or a disability which impairs a witness's ability to perceive, remember and narrate perceptions accurately is invariably admissible to impeach credibility."); *see also Commonwealth v. Conforti*, 202 A.3d 715, 730 (Pa. 2023) (reports of psychiatric

evaluations of co-defendants were impeachment evidence favorable to the defendant, and thus were subject to disclosure under *Brady*); *Commonwealth v. Davido*, 106 A.3d 611, 637 (Pa. 2014) ("[W]hen a witness suffers from a mental disability relevant to his or her ability to accurately observe, recall or report events, the jury must be informed of the disability in order to assist it in properly assessing the weight and credibility of the witness's testimony.").

235.    The defense also could, and would, have used this evidence to counter the Commonwealth's argument that Morales was unreliable because she had been threatened, instead showing that she was unreliable because she was suffering from an acute mental health crisis. *See* George Newman Certification.

236.    Moreover, the suppressed evidence provides information about Morales' interactions with law enforcement that was otherwise unavailable to Turner before trial. Had Turner been aware of these facts before trial, he could have cross examined not only Morales, but also Detectives Piree, Bova, Hoffner, and Starr, and ADA Buba about their interactions with Morales between February 3 and 26, 1987. *See Goodwin v. Wetzel*, No. 18-CV-5269, 2022 WL 2759047, at *14 (E.D. Pa. June 15, 2022) (evidence of detective's "improper interrogation tactics and lack of credibility provides a reasonable basis to question the verdict rendered by the jury"), *R&R adopted*, No. CV 18-5269, 2022 WL 2757702 (E.D. Pa. July 14, 2022). The suppressed evidence showed repeated and high-pressure interactions between Morales and law enforcement in the midst of a dire mental health crisis. *Brady* evidence is material where it can be used to impeach the police investigation. *See Dennis*, 834 F.3d at 313.

237.    The suppression of this critical information denied defense counsel an opportunity to investigate and effectively cross-examine the key witnesses at trial and to develop his trial strategy. Thus, the jury was prevented from fully assessing the credibility of Morales and the law

enforcement witnesses. There is a reasonable probability of a different outcome where, as here, defense counsel was denied information that directly undermined the reliability of a key witnesses—here the only witness—testimony and the police investigation. *See id.* at 311 ("Alterations in defense strategy and cross-examination at trial are precisely the types of qualities that make evidence material under *Brady*."); *Commonwealth v. Cam-Ly*, 908 A.2d 61, 76 (Pa. 2009) ("[W]e have held that the protection of *Brady* extends to the defendant's ability to investigate alternate defense theories and to formulate trial strategy.").

238.    The jury was already deadlocked, and, based on its questions to the Court, struggled with Morales' testimony. Had the jury known that she was in crisis to the point of being placed on a suicide watch when she identified Turner, it surely would have evaluated her testimony differently.

239.    Finally, although Morales' credibility was impeached at trial, the suppressed material is not cumulative of the impeachment offered at trial. The new impeachment evidence is of a fundamentally different character than the impeachment evidence available at trial—it is affirmative evidence that calls into question Morales' mental state, her ability to perceive and remember events, and her susceptibility to coercion by law enforcement. This evidence goes to a different point than the trial evidence because it impugns her mental state at the time she identified Turner. To the extent this evidence borders themes explored by defense counsel at trial, namely Morales' motivations for cooperating, this evidence is of a higher grade than the evidence available to Turner at his trial in that it is actual evidence showing the depth of Morales' interactions with police, and her unique vulnerability to coercion at that time, rather than speculation to that effect. *See Commonwealth v. Small* 647 Pa. 423 (Pa. 2018) ("new

evidence tending to prove a material fact that was in evidence at trial is not always 'merely' corroborative or cumulative, so long as it is of a higher and different grade or character.").

240.   The suppression each piece of evidence regarding Morales's mental state is a *Brady* violation. The due process violation is all the more clear when these items of evidence are considered cumulatively, as required by *Kyles*.

**CLAIM 2:   TURNER IS ENTITLED TO RELIEF BECAUSE PROSECUTORIAL MISCONDUCT SO INFECTED THE FAIRNESS OF HIS TRIAL AS TO VIOLATE HIS RIGHT TO DUE PROCESS**

241.   To constitute a due process violation, prosecutorial misconduct must be significant enough that it results in the denial of the right to a fair trial. *See Greer v. Miller*, 483 U.S. 756, 765 (1987). Conduct on behalf of the prosecutor that can rise to the level of a due process violation includes intentional actions, designed to "provoke the defendant into moving for a mistrial or conduct by the prosecution intentionally undertaken to prejudice the defendant to the point where he has been denied a fair trial." *Commonwealth v. Chmiel*, 777 A.2d 459, 464 (Pa. Super. 2001); *see also Commonwealth v. Smith*, 615 A.2d 321, 325 (Pa. 1992). Accidental errors can also constitute prosecutorial misconduct. *See Commonwealth v. Kearns*, 70 A.3d 881, 885 (Pa. Super. 2013).

242.   The touchstone of this analysis, therefore, is "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982); *see also United States v. Agurs*, 427 U.S. 97, 110 (1976) ("[I]f the suppression of the evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.").

243.   Without question, Turner's trial was unfair because of the actions and omissions of the Commonwealth.

244.   *First*, Turner was deprived of critical exculpatory material that directly contradicted the Commonwealth's theory that Morales was unreliable because she had been

48

threatened. He was deprived of impeachment material showing that the sole eyewitness was undergoing a serious mental health crisis when she identified him as the perpetrator, despite Newman's explicit demand for it.

245.     *Second*, the Commonwealth used the empty threat of the death penalty to convince Mr. Turner to "enthusiastically" waive a cognizable motion to suppress. N.T. 3/30/88, 2-3. At the moment that the parties put this agreement on the record in open court, the prosecutor did not have permission from her supervisors to pursue the death penalty, and, in fact, authorization to proceed was denied on the same day. *See* Note From ADA Ray Harley. As stated on the record, the consideration Turner received for dropping his meritorious suppression motion—especially with respect to Morales' statements—was the Commonwealth giving up its right to pursue the death penalty in the case.  This risk turned out to be illusory, and the prosecutor engaged in misconduct by threatening it.

246.     *Third*, the Commonwealth improperly vouched for Morales' credibility despite knowing that she had significant mental health issues. In closing, the prosecutor told the jury that Morales did not lack credibility, but instead was testifying as "a very brave young woman." N.T. 4/6/88, 134.

247.     *Fourth*, the Commonwealth impermissibly likened Turner to "the devil" during closing argument. *Id.* at 123.

248.     Each of these instances undermined the fundamental fairness of Turner's trial, but the cumulative effect is undeniable. Whether the prosecutor's actions were designed to provoke Turner to move for a mistrial or not, they certainly had that effect: defense counsel made three separate motions for a mistrial during this trial.

**CLAIM 3:     TURNER IS ENTITLED TO RELIEF BECAUSE THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL VIOLATIONS AT HIS TRIAL**

**RENDERED IT FUNDAMENTALLY UNFAIR, VIOLATING HIS DUE
PROCESS RIGHTS UNDER THE UNITED STATES AND
PENNSYLVANIA CONSTITUTIONS.**

249.    Even if this Court decides that Turner is not entitled to relief based on any

individual constitutional claim for lack of prejudice, it should grant him relief because the

cumulative impact of the constitutional errors rendered his trial fundamentally unfair, violating

his right to due process. *See Commonwealth v. Hutchinson*, 25 A.3d 277, 319 (Pa. 2011)

("[C]umulative prejudice from individual claims may be properly assessed in the aggregate when

the individual claims have failed due to lack of prejudice."); *Albrecht v. Horn*, 485 F.3d 103,

138-39 (3d Cir. 2007) ("[W]e recognize that errors that individually do not warrant *habeas* relief

may do so when combined.").

250.    Considered in the aggregate, the suppressed evidence of Morales' mental health

crisis, the fact that the death penalty was not available to the Commonwealth, and the other

instances prosecutorial misconduct caused overwhelming prejudice to Turner. The result of these

due process violations was a trial that was unfair, and in which Turner was unable to adequately

defend himself. The cumulative effect of the due process violations requires a new trial.

**CLAIM 4:    TURNER IS ENTITLED TO RELIEF UNDER THE UNITED STATES
AND PENNSYLVANIA CONSTITUTIONS BECAUSE BOTH PROHIBIT
THE INCARCERATION OF ONE WHO IS ACTUALLY INNOCENT**

251.    A claim of actual innocence may be a cognizable and free-standing basis for relief

under the Eight and Fourteenth Amendments to the United States Constitution. *See Herrera v.

Collins*, 506 U.S. 390, 406 (1993) (outlining what a freestanding actual innocence claim, not one

tied to underlying constitutional error at trial, would require and evaluating petitioner's claim of

actual innocence on its merits); *see also In Re Davis*, 557 U.S. 952, 557-58 (2009) ("[D]ecisions

of this Court clearly support the proposition that it would be an atrocious violation of our

Constitution and the principles upon which it is based to execute an innocent person." (internal quotation marks omitted)).

252.    The Pennsylvania Constitution also provides two separate potential avenues for relief based upon actual innocence: Article 1, Section 13 and Article 1, Section 9.

253.    Criminal punishment violates Article 1, Section 13 when it is so severe as to "shock the moral conscience of the community." *Commonwealth v. Sourbeer*, 422 A.2d 116, 123 (Pa. 1980) (effectively overruled on other grounds by *Miller v. Alabama,* 565 U.S. 1013 (2012)). The continued incarceration of an individual who is actually innocent would "shock the moral conscience of the community" and thus is an unconstitutionally cruel punishment under the Pennsylvania Constitution. *Cf. People v. Hamilton*, 979 N.Y.S.2d 97, 107 (N.Y. App. Div. 2014) (recognizing freestanding innocence claim, because "punishing an actually innocent person is inherently disproportionate to the acts committed by that person").

254.    Article 1, Section 9 of the Pennsylvania Constitution is referred to as "the due process clause of our state constitution" *Commonwealth v. Heck*, 535 A.2d 575, 576 (Pa. 1987). Where an interpretation of this provision is involved, "most cases which shed light on the question are analyses of the strictures imposed by the due process clause of the Fourteenth Amendment of the United States Constitution." *Commonwealth v. Davis*, 586 A.2d 914, 915-16 (Pa. 1991). However, the federal due process clause "may not be controlling if the due process clause of the Pennsylvania Constitution sets a higher standard." *Id.* at 916.

255.    As a matter of substantive due process, Pennsylvania appellate courts have regularly held that the state constitution provides individuals with greater protection than its federal counterpart. *See, e.g.*, *id.* at 917 (finding "no doubt that the due process clause of the Pennsylvania Constitution prohibits the depravation of liberty solely on the basis of hearsay

evidence" while acknowledging "doubt" that the federal due process clause would do the same).
Pennsylvania's history of fiercely protecting its citizens' rights against arbitrary state action
supports the recognition of a freestanding innocence claim under the state due process clause.

256.    Indeed, numerous other states have recognized a freestanding innocence claim
pursuant to their own state due process clauses. *People v. Washington*, 665 N.E.2d 1330, 1336
(Ill. 1996) (recognizing freestanding innocence claim under Illinois Constitution); *Hamilton*, 979
N.Y.S.2d at 107 ("Since a person who has not committed any crime has a liberty interest in
remaining free from punishment, the conviction or incarceration of a guiltless person, which
deprives that person of freedom of movement and freedom from punishment and violates
elementary fairness, runs afoul of the Due Process Clause of the New York Constitution…"
(internal quotation marks and citations omitted)); *Schmidt v. State*, 909 N.W.2d 778, 795 (Iowa
2018) (extending the right of a freestanding innocence claim to post-conviction applicants who
pleaded guilty).

257.    Accordingly, this Court should recognize a freestanding claim of actual innocence
under the Pennsylvania and federal Constitutions. Federal courts have never articulated the
precise burden of proving a right to relief on a freestanding innocence claim but have indicated
that it is "extraordinarily high." *Herrera*, 506 U.S. at 391.

258.    There is such clear and convincing evidence of Turner's innocence here that it
satisfies the "extraordinarily high" burden pondered in *Herrera*.

259.    Most fundamentally, there is no reliable evidence that ties Turner to this crime,
including no physical or forensic evidence.

260.    The single piece of evidence inculpating Turner was Morales' eyewitness
identification. Morales' credibility as a witness was questionable at trial, but with the recent

52

discovery that she was suffering an acute mental health crisis at the time she implicated Turner, there simply is no credibility to her testimony.

261.    Even if Morales was a credible witness, it is now well recognized that eyewitness identification, even under ideal circumstances, can be highly unreliable. *See, e.g.*, *Dennis*, 834 F.3d at 313 (McKee, C.J., concurring); *see generally Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014) (allowing courts to consider admitted expert testimony to explain factors that might lead to an unreliable identification). Here, Morales admitted to freebasing cocaine shortly before she heard the shooting and admitted she identified Turner by the sound of his voice. The conditions of the scene certainly support the idea that she could not have reliably identified the perpetrator—the hallway was dimly lit, she hid behind the door, and Martinez and the shooter fled up the stairway and out of her view.

262.    No other witness implicated Turner, no physical evidence connects him to this crime, the scene, or the victim.

263.    Because there is no reliable evidence that Turner committed this crime, he satisfies the burden for a claim of actual innocence under the Pennsylvania and United States Constitutions.

## REQUEST FOR EVIDENTIARY HEARING

264.    In view of the depth of the undisclosed information presented herein, and its effect on the already weak trial evidence, Turner is entitled to relief. However, should the Court disagree, at a minimum an evidentiary hearing would be required. Although he does not believe a hearing is needed, at such a hearing, Turner would call the following witnesses:

- David Turner
- Detective Walter Hoffner

53

- Detective Christopher Starr

- Detective Jeffrey Piree

- George Newman

- Rosemary Morales

- Andrea Foulkes

- Barbara Buba

265.    A certification of witnesses is attached as Exhibit 39.

266.    Counsel who will represent Turner in connection with this Petition are:

Amelia Maxfield (Pa. Atty. ID No. 328736)
The Exoneration Project
1712 N Street NW, Suite 401
Washington, DC 20036;

Nilam Sanghvi (Pa. Atty. ID No. 209989)
The Pennsylvania Innocence Project
1515 Market Street, Suite 300
Philadelphia, PA 19102; and

Thomas W. Hazlett (Pa. Atty. ID No. 88052)
Emily Horwitz (Pa. Atty. ID No. 332141)
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103.

267.    Counsel are not waiving any other issues Turner may have, and reserve the right

to supplement this Petition pursuant to Pennsylvania Rule of Criminal Procedure 905(A).

## CONCLUSION AND REQUESTED RELIEF

WHEREFORE, Petitioner David Turner prays that this Honorable Court will grant relief

in the form of arrestment of judgement and/or new trial.

Respectfully submitted:

*/s/Amelia Maxfield*
Amelia Maxfield (Pa. Atty. ID No. 328736)
THE EXONERATION PROJECT
1712 N Street NW, Suite 401
Washington, DC 20036
(771) 221-0441
amelia@exonerationproject.org

Nilam A. Sanghvi (Pa. Atty. ID No. 209989)
THE PENNSYLVANIA INNOCENCE PROJECT
1515 Market Street, Suite 300
Philadelphia, PA 19102
(214) 204-4255
nilam.sanghvi@painnocence.org

Thomas W. Hazlett (Pa. Atty. ID No. 88052)
Emily Horwitz (Pa. Atty. ID No. 332141)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
HazlettT@ballardspahr.com
HorwitzE@ballardspahr.com

*Counsel for Petitioner David Turner*

April 29, 2024

**IN THE COURT OF COMMON PLEAS**
**PHILADELPHIA COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| Respondent | : | |
| | : | |
| | : | CRIMINAL TRIAL DIVISION |
| | : | CP-51-CR-0304121-1987 |
| v. | : | |
| | : | |
| | : | |
| DAVID TURNER, | : | |
| Petitioner | : | |

**ATTORNY VERIFICATION**

The facts in this Petition are true and correct to the best of undersigned's knowledge, information, and belief, and are verified subject to penalties for unsworn falsifications to authorities under Pennsylvania Crimes Code Section 4904 (18 Pa. C.S. § 4904). Counsel have been authorized to file this Petition on Petitioner David Turner's behalf. Due to Mr. Turner's location at SCI Dallas, counsel have not yet obtained a verification from Mr. Turner. A verification will be filed to support this Petition as soon as practicable.

/s/ *Amelia Maxfield*
Amelia Maxfield, Esq.
Date of Birth: 12/05/1987

Date: April 29, 2024

**IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA,  :
Respondent                                            :
                                                                  :
                                                                  :      CRIMINAL TRIAL DIVISION
                                                                  :      CP-51-CR-0304121-1987
                   v.                                        :
                                                                  :
                                                                  :
DAVID TURNER,                                     :
Petitioner                                               :

## CERTIFICATE OF SERVICE

I, Amelia Maxfield, Esquire, being duly sworn according to law does hereby state and

aver that she is counsel for the petitioner in the above-captioned matter and that she has served

the foregoing Petition by electronic filing and e-mail, upon

          Carrie Wood, Esq.
          Assistant District Attorney
          Philadelphia District Attorney's Office
          3 South Penn Square
          Philadelphia, PA 19107

               /s/ Amelia Maxfield
               Amelia Maxfield (Pa. Atty. ID No. 328736)
               THE EXONERATION PROJECT
               1712 N Street NW, Suite 401
               Washington, DC 20036
               (771) 221-0441

               *Counsel for David Turner*

Date: April 29, 2024